IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| SHIRIN SAEIDI, Ph.D.,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE UNIVERSITY OF ARKANSAS; BRIAN RAINES, in his individual capacity; CHARLES F. ROBINSON, in his individual capacity; JAMES GIGANTINO, in his individual capacity; JAY B. SILVERIA, in his individual capacity and in his official capacity as President of the University of Arkansas System; CHRISTOPHER SCHULTE in his individual capacity; WILLIAM SCHRECKHISE in his individual capacity; DAN SULLIVAN, in his individual capacity; BENJAMIN WEINTHAL; LAWDAN BAZARGAN; and ALLIANCE AGAINST ISLAMIC REGIME OF IRAN APOLOGISTS,<br><br>Defendants. | Case No. 5:26-cv-05260-JTS<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Through her undersigned counsel, Dr. Shirin Saeidi alleges with knowledge as to her own acts, status, and acts taking place in her presence, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. Dr. Shirin Saeidi is a scholar of political science. She earned her doctorate at the University of Cambridge, and Cambridge University Press published her scholarship in a book,

*Women and the Islamic Republic: How Gendered Citizenship Conditions the Iranian State*.[1] For seven years she taught at the University of Arkansas, Fayetteville, and (the “Uni throughout that time the University promoted her and granted her tenure. She is the former Director of the University's King Fahd Center

2. Dr. Saeidi is a Shia Muslim and was born in Iran. She emigrated as a child with her family to the United States and is a naturalized citizen of the United States.

3. In August 2023, she submitted two expert letters to a Swedish appellate court on the methodology of witness testimony in a case concerning Iran.

4. That testimony drew the attention of Defendant Lawdan Bazargan. Bazargan directs the Alliance Against Islamic Regime of Iran Apologists (“AAIRIA”), a nonprofit based in California.

5. Bazargan's method, and the stated mission of her organization, Defendant AAIRIA, is to brand Shia Muslim academics as operatives and “apologists” in the campaign's from academic posts.

6. Beginning no later than March 2025, Bazargan and AAIRIA openly worked toward a single declared objective: ending Dr. Sa They launched an obsessive, multifaceted media campaign to brand Dr. Saeidi an agent of the Iranian government using a stream of letters and mass emails to the Univ routed through Arkansas legislators, threats false accusations of plagiarism to her degree-granting university and her academic press book publisher, and

[1] SHIRIN SAEIDI, WOMEN AND THE ISLAMIC REPUBLIC: HOW GENDERED CITIZENSHIP CONDITIONS THE IRANIAN STATE (Cambridge Univ. Press 2022).

coordinating with anti-Islam and anti-Iran publications, lobbying groups, and writers, such as Defendant Benjamin Weinthal.

7. In fact, Bazargan led three different campaigns against Dr. Saeidi to get her fired: One alleged misconduct regarding Dr. Saeidi's expert opinions in the Swedish courts, the second alleged Dr. Saeidi is antisemitic, and the third fabricated allegations of plagiarism.

8. Defendant Bazargan associated her campaigns against Dr. Saeidi on social media with the hashtag #FireSaeidi.

9. At first, the University's internal processes rebuffed the #FireSaeidi campaign. The University's compliance office investigat Dr. Saeidi of antisemitic posts for three months before making its November 24, 2025 finding that antisemitism did not occur.

10. As an employee, Dr. Saeidi relied on the University, her employer, to protect her from the campaign and made multiple reports to the University about the campaign's al against her and its harassment of her. None of these reports were ever investigated.

11. Rather, two third-party sponsored complaints were made to t compliance office, alleging antisemitism against Dr. Saeidi.

12. Arkansas State Senator Dan Sullivan joined the #FireSaeidi campaign in its final phase. He played an influential with a letter to the University the cam stating that the University's funding is tied to its degree of compliance with Arkansas Act 721, which requires public universities to report and take appropriate action against antisemitism claims on their campuses.

13. By December 2025, the University fully adopted Bazargan's posi to terminate Dr. Saeidi's employment. Eleven days after the first antisemitism complaint against Dr. Saeidi was found inactionable by the University's Ti Defendant Brian Raines, Dean

of the University's Fulbright College of Arts removed Dr. Saeidi as Center Director over the same social media posts that had previously found not to be antisemitic. That same morning, Bazargan emailed every member of the Board of Trustees demanding a review of D Three days later, the University's Associate V state legislature, filed an internal complaint about a repost on X that Dr. Saeidi did not author, relaying it from "a legislative source" and i was filed, investigated, and sustained in only seven days, while the first office of equal opportunity compliance ("OEOC") complaint against Dr. Saeidi was investigated over the course of three months.

14. On December 15, 2025, Bazargan emailed Dean Raines directly to report recent adverse comments made by Dr. Saeidi regarding Raines and the University, calling for her termination, and Raines forwarded the message to the Fulbright College of Arts and Sciences ' human resources office. In the hours that ensued, the University finalized its antisemitism case against Dr. Saeidi, and Dean Raines recommended her termination the next day.

15. Three days after the Dean recommended her dismissal, Sullivan wrote to the University's leadership on Senate letterhead and released the letter to the press the same day. Dr. Saeidi was the focus of the letter, and the letter repeated the AAIRIA campaign's accusations against Dr. Saeidi. Senator Sullivan's letter violation of Arkansas Act 721 of 2025, the Universi constituting a threat to the under" Act 721; President Silveria confirmed as much when his termination letter to Dr. Saeidi relied on Defendant Sullivan's letter and on the Univer under Act 721.

16. At the request of Dr. Saeidi, the University convened a committee of eight senior professors to evaluate the six charged grounds for termination in February of 2026. After a daylong hearing consisting of testimony from Dean Raines, Dr. Saeidi, and Chancellor Robinson, the committee voted eight to zero that none of the charged grounds supported dismissal. The committee recommended that Dr. Saeidi return to the classroom.

17. On March 26, 2026, University of Arkansas System President Jay Silveria rejected the faculty committee's unanimous recommendation and terminated her. By his own words, his decision rested on the [Equal Opportunity, Compliance & Title IX] Office's find and the reasons discussed in Dean Raines's lette which related funding pursuant to Act. 721.

18. On May 20, 2026, the Board of Trustees made the termination final. Bazargan was still writing to the Chancellor and the Trustees in the days before and on the day of the Board's vote.

19. Bazargan publicly gloated about Saeidi's terminati writing that "the #FireSaeidi campaign, led b helped, resulted in her dismissal from the un *See Figure 1.*




*Figure 1*: Bazargan post taking credit for

20. In terminating Dr. Saeidi, the University ignored its em

that she was being threatened; investigated no one she reported; disciplined her retroactively for conduct it had reviewed and approved in writing; converted her harassment reports into investigations of her; permitted the official she had twice accused of discrimination to remove her from her directorship and then recommended her dismissal; confined the hearing so that the actions already taken could not be reviewed; overrode the unanimous recommendation of its own hearing committee; disregarded its own governing policy protecting scholarly expression; and terminated a professor its own processes had cleared, while citing its funding exposure.

21. The University defendants include the University of Arkansas Board of Trustees, Dean Brian Raines, Chancellor Charles F. Robinson, Senior Vice Provost James Gigantino, former Associate Dean for Academic Affairs at Fulbright College of Arts and Sciences Christopher Schulte, Chair of the Department of Political Science William Schreckhise, and University of Arkansas System President Jay B. Silveria. University officials carried out the #FireSaeidi campaign objectives of Defendants Bazargan, AAIRIA, and Weinthal in terminating Dr. Saeidi's employment. Arkansas State Senator Dan Sullivan is sued in his individual capacity for his acts committed outside the sphere of legislative activity to pressure the University to fire Dr. Saeidi.

22. Dr. Saeidi brings claims under 42 U.S.C. § 1983 against the responsible University officials for retaliation against her protected speech, violation of her right to the free exercise of religion, and denial of equal protection. She also brings the aforementioned claims against State Senator Dan Sullivan, but for the violation of her right to the exercise of religion. She brings § 1983 claims against Bazargan, the AAIRIA, Weinthal, and University officials as willful participants in joint action and a conspiracy claim under 42 U.S.C. § 1985(3) for their conspiracy to deprive Dr. Saeidi of her federal Constitutional rights. Dr. Saeidi also brings a 42 U.S.C. § 1986 claim for the University's neglect to prevent that conspiracy. She brings a Title VII against her former employer for religious and national-origin discrimination and retaliation; for breach of contract under Arkansas law against university officials for breach of academic freedom provisions of the University. She brings the following additional claims against Defendant Bazargan and Defendant AAIRIA: violations under Arkansas law for defamation, false light, tortious interference, and well as hate crime under the Arkansas Civil Rights Act of 1993 § 16-123-106. Defendant Weinthal is further included as a

defendant in the Arkansas civil conspiracy claim. Defendant Jay Silveria is sued in his official capacity as the state official responsible for an enforcing an unconstitutional Arkansas law: Act 721.

**JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), and under 42 U.S.C. § 2000e-5(f)(3) for the Title VII claims. The Court has supplemental jurisdiction over the Arkansas claims under 28 U.S.C. § 1367(a). The state law claims and the federal claims arise from the same campaign, the same statements, and the same termination and form part of the same case or controversy.

24. The claims against Bazargan and AAIRIA, also stand on an independent jurisdictional footing under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Virginia. Defendant Bazargan is, on information and belief, a citizen of California. Defendant AAIRIA is, on information and belief, a California nonprofit corporation with its principal place of business in Los Angeles County, California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

25. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3). The employment practices at issue took place in Washington County, Arkansas, where the University of Arkansas is located, where Dr. Saeidi worked, and where her employment records are maintained. A substantial part of the events giving rise to the state law claims occurred there as well.

26. This Court has personal jurisdiction over Bazargan, AAIRIA, and Weinthal because of their own contacts with Arkansas, and not merely the effects in Arkansas of out-of-state conduct. Bazargan and AAIRIA sent at least four formal letters and repeated emails into

Arkansas, addressed to the University's Chanc, every member of its Board of Trustees, and its System President, each of whom they knew to be in Arkansas. They enlisted and communicated with Arkansas legislators. They publicly called on people in Arkansas to support the campaign to have Dr. Saeidi fired from her Arkansas employment. Weinthal wrote to University officials in Arkansas about Dr. Saeidi on May 9, May 21, and May 23, 2025, copying the Chancellor's office and University Relations on May 21 and asking whether she would be fired and whether she planned to resign. On August 20, 2025, he sent the Chancellor's office the antisemitism allegations that the Chancellor referred for investigation, and University Relations answered him in writing on August 23 and 27. Those communications were the instruments of the campaign, not incidents of it: each was directed into the state for the purpose of procuring an Arkansas employer's decision about an Arkansa contacts.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

27. On July 6, 2026, Dr. Saeidi filed EEOC Charge No. 493-2026-02601 against the Board of Trustees. The Commission received and verified the charge on July 7, 2026. The charge alleged discrimination because of religion and national origin and identified as unlawful employment practices the decision to terminate her employment, communicated to her on March 26, 2026, and the Board of Trustees' final ac the charge and issued Dr. Saeidi notice of her right to sue on July 8, 2026. *See* Exhibit 2. This action is filed within ninety days of her receipt of that notice.

28. On August 6, 2026, Dr. Saeidi filed a second, standalone charge against the Board of Trustees that the EEOC labeled as Charge No. 493-2026-02927. It alleged retaliation for her protected speech and charged the same two discrete acts. On August 14, 2026, the Commission

closed the retaliation-based charge, deeming it duplicative of Charge No. 493-2026-02601. *See* Exhibit 3. The Commission's own determination thus tre the practices alleged in the first charge, on which notice of right to sue has been issued.

29. Each unlawful employment practice on which Counts V and VI of this Complaint are founded was charged. The March 26, 2026 termination decision and the May 20, 2026 final Board action are each discrete acts, and each occurred within one hundred eighty days before July 6, 2026.

**PARTIES**

30. Plaintiff Shirin Saeidi, Ph.D., is an Iranian-born scholar and a Shia Muslim. She was a tenured Associate Professor of Political Science at the University of Arkansas, Fayetteville, and Director of its King Fahd Center for Middle East Studies until her removal as Center Director on December 5, 2025 and termination from employment with the University effective May 20, 2026. She is a resident of Virginia. Dr. Saeidi's research fo rights in the Middle East with a particular f

31. Defendant Board of Trustees of the University of Arkansas governs the University of Arkansas System and the University of Arkansas, Fayetteville. At all relevant times it was Dr. Saeidi's employer within the sued under Title VII only.

32. Defendant Brian Raines is the Dean of the Univers Fulbright College of Arts and Sciences. Raines issued the July 1, 2025 warning letter to Dr. Saeidi, removed her as Center Director on December 5, 2025, and recommended her dismissal for cause on December 16, 2025, while she had two pending discrimination complaints against him. He is sued in his individual capacity. Per the 2025-2026 University Faculty Handbook, Section 1.2, Deans are the

chief administrative officials of the college considered the "execut University of Arkansas that consists of divisio Fulbright College. He reports to the Provost and "under cer directly to the circumst Chancellor. As dean, he is "responsible for" and is applicable to the school or college." He is r promotions, and other personnel changes to the Provost and Executive Vice Chancellor for Academic Affairs after consultation with appropriate members of the department concerned, other related department heads, and the deans authorized to "determine the dual members of their and ass faculty and staff."

33. Defendant Charles F. Robinson is the Chancellor of the University of Arkansas. Robinson routed a reported harasser's accusations concurred in the dismissal recommendation, initiated formal dismissal proceedings, suspended her, barred her from campus, and confined the scope of her hearing. He is sued in his individual capacity. Pursuant to University of Arkansas Board of Trustees Board Policy 100.4, Charles Robinson, as chancellor, exercises "complete established by the Board of Tru and the official and the spokesperson for the campus and shall promote the educational excellence and general development and welfare of the campus." He is administrative committees and officers of that campus, and all projects, programs, and institutional reports to be undertaken on behalf of that campus shall be subject to authorization and approval of the Chancellor." As chancello medium of communication between the President and all deans, heads of departments and

department chairs and all other administrativ He is directly responsible to the Provost and the University's e executive vice chancellors.

34. Defendant James Gigantino was Senior Vice Provost of the University of Arkansas during the timeline of the events alleged in this Complaint. Gigantino directed the pull of Dr. Saeidi's of-interest records as the #FireSaeidi campaign demanded, participated in preparing the pre-drafted warning letter that Dean Raines issued at his recommendation, and converted the repo cusations into an OEOC investigation of Dr. Saeidi. He is sued in his individual capacity.

35. Defendant Christopher Schulte was the Associate Dean for Academic Affairs at University of Arkansas Fulbright College of Arts and Sciences; this college includes the political science department where Dr. Saeidi was a tenured member of the faculty. Per the University's Faculty Handbook, Section 1.2, Schulte was one of Dr. Saeidi's while she was employed at the University. He was involved in the dismissal and termination of Dr. Saeidi. As Associate Dean, he was responsible for assisting Dean Raines with executing university policies as applicable to Fulbright College per section 1.2 of the Faculty Handbook. Defendant Schulte is currently employed at the University as an Associate Director of the School of Art and Endowed Professor of Art Education.

36. Defendant William Schreckhise is a tenured political science professor and the chair of the political science department at the University of Arkansas. Per the Faculty Handbook, Section 1.2, department chairs are of the department" and are required to call m department He was one of Dr. Saeidi's supervisor Associate

Professor of political science. Dr. Saeidi initially reported her 2023 letters that she submitted to the Swedish court to Defendant Schreckhise, who okayed her reporting of the potential conflict.

37. Defendant Jay B. Silveria is President of the University of Arkansas System. He is sued in his individual capacity for damages and in his official capacity for prospective injunctive relief, including reinstatement, and declaratory relief to declare Arkansas Act 721 unconstitutional. Pursuant to University of Arkansas Board of Trustees Board Policy 100.4, Jay Silveria, as president of the University of A
of the affairs and execution of the policies of the University of Arkansas and all of its campuses, divisions, and units of his position, he has “a administration.” As
to effect these functions and meet these resp
contract on behalf of the Board of Trustees a
responsible for liaison with the General Assembly, the Governor, state offices and governmental bodies, and the federal government.” He is al
enforcement of all laws relating to the University and of all resolutions, policies and procedures . . . ”

38. Further, Mr. Silveria, has a “duty to b
which, in his or her opinion, affect the Univ
bringing matters before the board, he is responsible for ensuring that there are “appropriat
materials provided to the Board members and sufficient time for thoughtful discussion before decisions are requested.” Lastly, he is responsible for “facilitating the promot
programs, and needs of each campus after cons

39. Defendant Lawdan Bazargan is an individual who, on information and belief, resides in California. She is the leader and principal public organizer of the #FireSaeidi

campaign described in this Complaint. Per the Alliance Against Islamic Regime of Iran Apologists' public filings, she is its chief executive officer. Bazargan is an activist opposed to Islam and, specifically, to Shia Islam; she has published dozens of social media posts disparaging the faith, including multiple declarations that Islam is a "cult" and not a religion.

40. Defendant Alliance Against Islamic Regi

California nonprofit corporation with its principal office in Los Angeles County, California. It lists Bazargan as its Chief Executive Officer and its agent for service of process, Hamid Charkhkar as its Chief Financial Officer, and Fatemeh Pishdadian as its Secretary. Its stated mission is to expose academics it labels “ope what it calls the Iranian “regime,” and to procure their removal from a

41. Defendant Benjamin Weinthal is, on information and belief, a United States citizen residing in Jerusalem. He is a Writing Fellow of the Middle East Forum, an advocacy organization whose Campus Watch project publishes material on Middle East studies faculty, including a list of "Professors to Avoid," and was for years a research fellow at the Foundation for Defense of Democracies. He also writes for Fox News Digital and the New York Post. The Middle East Forum republished his articles about Dr. Saeidi under its own name on December 13 and 18, 2025 and September 6, 2026. He has written repeatedly about Iranian academics targeted for removal from American universities, and he frequently quotes AAIRIA and Bazargan as sources. Beginning May 9, 2025, he wrote directly to University officials to pressure them to terminate Dr. Saeidi.

42. Defendant Dan Sullivan is a member of the Arkansas Senate, representing the 20th District. At all relevant times he was Vice Chair of the Senate Committee on Education and a member of the Joint Budget Committee, the Legislative Joint Auditing Committee, the Joint

Performance Review Committee, and the Senate Committee on State Agencies and Governmental Affairs. He is the sponsor of Act 116 of 2025. He is sued in his individual capacity for acts outside the sphere of legislative activity, including authoring a letter to the University, released to the press, exhorting the University to punish Dr. Saeidi.

## FACTS[2]

### A. Dr. Saeidi's tenure at the University of A

43. In 2018, Dr. Saeidi joined the University of Arkansas faculty as a political science faculty member on the tenure track. She obtained tenure in 2023. In July of 2022, she became director of the University's King Fahd Center for Middle East Studies. During her approximately seven years at the University, was promoted and tenured without incident.

44. In August 2023, Dr. Saeidi submitted two expert letters to a Swedish appellate court in a high-profile case concerning Iranian citizen, Hamid Nouri. In the letters addressed to the Swedish court, Dr. Saeidi analyzed the methodology of the witness testimony presented in the human rights case, using her own fieldwork experience, expertise, and specialized knowledge.

45. She disclosed the submissions to the University in writing on September 6, 2023. The University's conflict-of-interest office responded that her unofficial disclosure” and directed her to fi opened. She filed the form on November 14, 2023. On June 13, 2024, the University resolved the disclosure: “Approved . . . Disclosure is ade

46. Her standing at the University only rose in the period that followed. She was rated in the top tier of her department for merit in 2023 and 2024. She received a merit-based raise

[2] For aid in following the facts in this case, a visual timeline of the facts is attached as Exhibit 1.

effective July 2025. In April 2025, her department gave her its Outstanding Teacher Award, and a senior colleague nominated her for the Alum Achievement award for rising teachers. She was the first woman, the first Muslim, and the first Iranian American to direct the King Fahd Center in its history.

47. In July 2024, Brian Raines joined University of Arkansas as Dean of the Fulbright College of Arts and Sciences.

48. Dr. Saeidi's first meeting with Brian Raines September of 2024 when an invitation appeared without context on Dr. Sa

49. Dr. Saeidi attended the unanticipated meeting, along with Dr. Jennifer Hoyer, Professor and Director of Jewish Studies, and additional faculty colleagues.

50. During this meeting, Dr. Saeidi was singled out for interrogation by Raines regarding the joint Jewish Studies – Middle Eastern Studies search to hire a Visiting Scholar to teach courses on Israel. This interrogation was framed around politically charged topics that appeared to be associated with Dr. Saeidi's Muslim and Middle Eastern identity.

51. Despite the search being a joint venture between the Jewish Studies department and the Middle Eastern Studies department ("MEST"), requiri agree to any hiring decisions, Raines' questioning directed Dr. Saeidi. He aggressively interrogated Dr. Saeidi as to why she had chosen an allegedly Anti-Zionist Israeli candidate.

52. Raines asked Dr. Saeidi specifically if she believed Israel is a settler-colonial state. He did not ask this question of anyone else in the meeting. He also complained to Dr. Saeidi about calls he had allegedly received regarding the hiring decision.

53. Following this meeting, Raines approached Dr. Saeidi and stated, “If I keep getting complaints about you, there’s no way.” He further stated to Dr. Saeidi that he would be exercising greater authority over MEST and that “everything w reported to him.

54. Dr. Saeidi noted that Brian Raines’ exe the Middle Eastern Studies department and did not appear to be applied to the Jewish Studies department or any other similar department.

55. Following this negative first encounter with Dean Raines, Dr. Saeidi anxiously attempted to comply with the disparate directives given to her by Raines. She went from seldomly meeting with University administrators to being required to have a standing meeting with Assistant Dean for Academic Affairs Chris Schulte. Schulte began contacting Saeidi outside of work hours, furthering Saeidi’s anxiety an over the sudden increase in oversight of her University responsibilities.

56. Schulte began attending MEST events in an almost surveillance capacity, in which he sat in the back row at MEST events and took notes. When Saeidi inquired as to why the notetaking was necessary, she was told that the aim is to have a witness in case someone complained about MEST events.

57. With the hiring of Dean Raines, what were originally routine managerial matters related to Dr. Saeidi’s position as Director became administrative micromanagement and escalated into disciplinary action by Raines and other University administrators. All MEST events, posters, and announcements had to be The Dean’s office was concerned that a poster or image could result in a complaint despite, on information

and belief, the University receiving no complaints from University affiliates about MEST events during this time.

58. Brian Raines, Chris Schulte, and others inquired into MEST student projects, study abroad experiences, and ultimately faculty syllabi.

59. On September 20, 2025, Dr. Saeidi informed Brian Raines, Chris Schulte, William Shreckhise, and the University Conflict of Interest office via email of a formal invitation that she received on September 19th to attend a press-like conference with President of Iran in New York City during the week of the U.N. General Assembly. She viewed this invitation as an opportunity to obtain insight on Iranian-U.S. policy and political challenges currently faced by Iran, topics that directly related to her area of research.

60. On that same date, William Schreckhise
Stephanie Schulte, the Associate Dean for Social Sciences, stating the following: "Please see below and let me know if you have any advice.
isn't travelling to a county on the naughty l
problems. But please let me know if you do."

61. On September 22, 2025, Stephanie Schult
Chris Schulte, asking if there were any issue

62. On September 22, 2025, both Chris Schulte and Benjamin Purvis of the University's Office of Research Integrity and separately forwarded
invitation to Gigantino.

63. On September 22, 2025, Gigantino forwarded Dr. Saeidi's invitat
Indrajeet Chaubrey, Randy Massanelli, and Bill Kincaid, stating the following: "FYI, for
discussion."

64. On that same date, Gigantino forwarded the invitation to Hannah Henderson, Chief of Staff to Chancellor Robinson, statin happening."

65. Gigantino also forw Margaret Sova McCabe, Vice 's invit Chancellor for Research & Innovation, and Allen Phelps, the University's Act Security Officer, to request if any federal regulations would prohibit a UA faculty member from visiting with President o

66. On September 23, 2025, Dean Raines' ass Bill Schreckhise, and Chris Schulte, stating he needed to meet with them as soon as possible regarding Dr. Saeidi's travel.

67. Dr. Saeidi responded to Dean Raines' em but could meet virtually.

68. Dr. Saeidi had a Teams call with Dean Raines that same day, in which he vehemently discouraged her from visiting with the President of Iran. In an email from Dean Raines memorializing their conversation by Teams, Dean Raines thanked Shirin for agreeing with him that she should not meet with the President of Iran.

69. In his email, Dean Raines notes that Ir adversary" and that her meeting with the Iran consequences for the University, Fulbright College, and the King Fahd Center for the Middle East Studies."

**B. Lawdan Bazargan and the AAIRIA begin harassing Dr. Saeidi through their #FireSaeidi campaign.**

70. Dr. Saeidi and her work caught the attention of Lawdan Bazargan, who leads a nonprofit called the Alliance Against Islamic Regime of Ir

71. Bazargan frequently espouses Islamophobic beliefs online. She and her organization, the AAIRIA, target Iranian and Shia Muslim academics at American universities.

72. On November 20, 2025, Bazargan wrote to a reporter for the Chronicle of Higher Education that AAIRIA's "campaigns have contributed to the dismissal or exposure of" Mohammad Jafar Mahallati, "removed from Oberlin College"; Seyed Hossein Mousavian, "sent to retirement by Princeton University"; Behrooz Ghamari-Tabrizi, "removed from Princeton University"; and Ali Akbar Mousavi Khoeini, "removed from George Mason University." Each of the four are Iranian academics.

73. Bazargan and her team lead campaigns that conspire in joint action with extensive network of lobbying groups, media outlets and officials abusing their authority to remove from their posts numerous professors in the United States who are Iranian and Shia Muslim. Bazargan has published dozens of posts disparaging Islam, including describing Islam as a ." *See Figure 2*. Bazargan wrote, in August 2021, more than three years before the #FireSaeidi campaign against Dr. Saeidi began, that "Islamists & thei the academia & pretend that Islam is a religion of peace & brotherhood. Islam started & spread with swords & we must stand up against it." *See Figure 3*.




*Figure 2: Bazargan post* that Islam is a “divisive c




*Figure 3: Bazargan post* on “Islamists” in academia

74. Further examples of Bazargan's published Islamophobic statements include:

- On November 3, 2023 at 9:18 PM, Bazargan wrote on X (formerly Twitter) through her account @LawdanBazargan that Islam is “a cult r[3] *See* *Figure 4*.

[3] https://x.com/lawdanbazargan/status/1720626639317434606 [https://perma.cc/8V9R-WXRL].




*Figure 4: Bazargan post that states* "Islam is a cult not a re

- On April 11, 2024 at 6:29 PM, Bazargan [illegible] X: "Welcome to the reality of Islam & Muslims. They come to your home, break your rules, and then go sue and claim abuse. Imagine what they do when they have power like the Islamic Regime of Iran or Taliban in Afghanistan."[4] *See Figure 5.*

---

[4] https://x.com/LawdanBazargan/status/1778566063820828789 [https://perma.cc/5AC9-ACA2].



Lawdan Bazargan
@LawdanBazargan

Welcome to the reality of Islam & Muslims. They come to your home, break your rules, and then go sue and claim abuse. Imagine what they do when they have power like the Islamic Regime of Iran or Taliban in Afghanistan.

Laura Powell @LauraPowellEsq · Apr 11, 2024
I appeared on this @KTVU news segment, which unfortunately grants far too much air time to Malak Afaneh, the law student who disrupted the Berkeley dean's dinner. But it's interesting to hear her thinking. She seems pretty smug for someone who claims to have suffered an attack.



6:29 PM · Apr 11, 2024 · 2,273 Views

*Figure 5*: Bazargan post on "the reality of

75. On September 7, 2025, Bazargan posted two photographs of Dr. Saeidi, one without a hijab and one wearing it with the Shirin Saeidi, the same person, two different realities. One day, hij and defending state narratives in Tehran. Is colors depending on the location? … This isn'

academic tit[5] Dr. Saeidi #FireSaeidi hijab . was offered as p

to a foreign government.

76. On the same day, Bazargan posted a photograph of Dr. Saeidi's attorney in a then

kufi and thobe and wrote that "it doesn't eve — especially when

this guy on the left is her lawyer legal. Yes, We will

not be silenced. We will not apologize. And w[6]

77. On September 22, 2025, in a public Twitter Space, Bazargan said that Dr. Saeidi's lawyers "look like the Taliban."

78. Between 2020 to present, Bazargan published dozens of similar statements about Islam and about Muslims.

79. On March 24, 2025, Bazargan and AAIRIA submitted a formal complaint to Chancellor Robinson, raising concerns about Dr. Saeidi and requesting an answer as to whether the University endorses or disavows the statements made by Dr. Saeidi.

80. On March 25, 2025, Bazargan named Dr. Saeidi an agent of the Islamic Republic of Iran on an Israeli news channel.[7]

81. On information and belief, in early Apr

name to Arkansas legislators and demanded her immediate removal.

82. On April 3, 2025, Bazargan announced on Twitter that the AAIRIA had met with "high-ranking members of the Education and Oversight Committees of the U.S. Congress to raise urgent concerns about the presence of Islamic Republic of Iran (IRI) apologists embedded

[5] https://x.com/LawdanBazargan/status/1964787375663714611 [https://perma.cc/2TST-TAX9].
[6] https://x.com/LawdanBazargan/status/1964759454739792226 [https://perma.cc/85BR-7JPM].
[7] https://www.youtube.com/watch?v=6VDiy9hQetM [https://perma.cc/3RYY-BZ6D].

in American academic institutions”[8] that it had given Congress the names of eight university professors in the United States it claimed have ties to Iran, tagging the University of Arkansas.[9]

83. On April 25, 2025, Bazargan and the AAIRIA sent a second letter to Chancellor Robinson, noting that the University had not responded to their first letter and that they request a response.

84. On May 1, 2025, Bazargan and the AAIRIA contacted the University again, demanding that they investigate Dr. Saeidi further based on their allegations that she engaged in academic misconduct. In this letter, Bazargan reminded Ch

instrumental in the campaign that led to the dismissal of Mohammad Jafar Mahallati from Oberlin College” but that they “do not seek t This reminder was wielded as a threat to encourage action on the part of the University should they want to avoid going down the path of Oberlin College.

**C. The Arkansas State Legislature passes Act 721.**

85. On April 15, 2025, the Arkansas State Legislature passed Act 721: “To Prohibit Antisemitism in Public Elementary and Secondary Schools; and to Prohibit Antisemitism in State-Supported Institutions of Higher Education.”[10] This bill was signed into law by Arkansas Governor Sarah Huckabee Sanders, on April 17, 2025.

86. Effectively, Act 721 prioritized antisemitism over other protected grounds, created specific reporting requirements for public universities and schools regarding

---

[8] https://x.com/LawdanBazargan/status/1907681208634388921 [https://perma.cc/WF8Q-FV59].

[9] On information and belief, seven of those eight academics include Hossein Mousavian of Princeton University, Hamid Dabashi of Columbia University, Behrooz Ghamari-Tabrizi of Princeton University, Shirin Saeidi of the University of Arkansas, Ali Akbar Mousavi Khoeini of George Mason University, Janet Afary of the University of California, Santa Barbara, and Paymam Mohseni of Harvard University.

[10] https://arkleg.state.ar.us/Home/FTPDocument?path=%2FACTS%2F2025R%2FPublic%2FACT721.pdf [https://perma.cc/FS5E-7W9L].

antisemitism allegations, and conditioned state funding of public universities and schools to be based on their compliance with the review and reporting of antisemitism complaints.

87. Act 721 defines antisemitism as it was International Holocaust Remembrance Alliance (‘IHRA’) in its working definition of antisemitism, including its contemporary examples, as it was adopted on M “Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.

88. Act 721 includes the following carve outs regarding free speech: “[n]othing in this act shall be construed to diminish or infringe upon any right protected under the First Amendment to the United States[,] Constitution or Arkansas Cons “Nothing in this act shall be construed to co Lastly, “Criticism of Israel similar to the c be regarded as antisemitic.”

**D. Bazargan and AAIRIA colludes with a member of the Arkansas legislature to manufacture an antisemitic basis for their #FireSaeidi campaign, relying on Act 721 and threats to the University’s funding.**

89. On information and belief, on May 2, 2025, Bazargan publicly stated that an Arkansas legislator had advised AAIRIA that Dr. Saeidi’s court testimony was not a sufficient ground for termination, and that AAIRIA would establish an antisemitism basis instead.

90. For the antisemitism campaign, Bazargan relied on her contacts in media and advocacy groups, particularly defendant Benjamin Weinthal, to publicize accusations of

antisemitism against Dr. Saeidi. This was part of the well-documented strategy utilized by Bazargan and the AAIRIA to escalate action against the Iranian academics on their list.[11]

91. On May 9, 2025, Defendant Weinthal reached out to the University under the guise of a Fox News press inquiry, pressuring it to investigate Dr. Saeidi and the allegations made against her by the AAIRIA in their recent letter to the University.

92. On information and belief, on or before May 9, 2025, Bazargan gave Weinthal AAIRIA's letter to the University and its accusations against Dr. Saeidi, and the two agreed that he would press the University for an investigation and publish the accusations.

93. By May 10, 2025, at least three formal AAIRIA letters had been sent to the University regarding Dr. Saeidi, and Bazargan publicly called on similarly-slanted, Persian-language publications to follow Weinthal's lead[12]

94. On May 20, 2025, a fourth letter was emailed to Chancellor Robinson, accusing Dr. Saeidi of admiration for Iran's Supreme L affiliation with authoritarian institutions, and urged an "independent review." She posted the contents of the letter publicly, tagging Senator Tom Cotton, Senator John Boozman, Representative Rick Crawford, Representative Bruce Westerman, Representative French Hill, Representative Steve Womack, and Governor Sarah Huckabee Sanders.[13]

---

[11] It was through AAIRIA's strategy that Mohammad Jafar academic leave from Oberlin College in December of 2023. In his case, AAIRIA relied on accusations of antisemitism and inquiries made by the United States Congress and the Education and the Workforce Committee (as prompted by AAIRIA) to escalate the review of Mahallat *See* https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=409891 [https://perma.cc/NV32-HWGB]. The strategy employed by AAIRIA in Mr. Mahallati's cas review, as is the AAIRIA Dr. Saeidi *See* https://aairia.org/apologists/mohammad-jafar-mahallati/. [https://perma.cc/7F56-D89A]; https://aairia.org/apologists/shirin-saeidi/ [https://perma.cc/NT43-FAUC].

[12] https://x.com/LawdanBazargan/status/1921245320312426894 [https://perma.cc/2NRJ-N2HA].

[13] https://x.com/LawdanBazargan/status/1924895005078147231 [https://perma.cc/XGJ9-GWLZ].

95. On that same date, a Canadian citizen with no ties to the University emailed William Schreckhise to report Dr. Saeidi's "u
Nouri case.

96. Schreckhise forwarded the email to Chris Schulte and Stephanie Schulte, adding that he was "not interested in launching a 'full invest
faculty member's rights of academic freedom."

97. On May 21, 2025, Weinthal supplied the fabricated accusations again, copying Chancellor Robinson and University communications. On the same date, Dr. Saeidi notified Associate Vice Chancellor for University Relations Mark Rushing of the harassment by Bazargan and Weinthal.

98. On June 6, 2025, Weinthal wrote to Mark Rushing that he had learned from Bazargan that the FBI had contacted her regarding Dr. Saeidi and inquired as to whether the University planned to fire her.

99. On July 10, 2025, Bazargan wrote Chance
investigation into the potential misuse of un
third parties. The letter threatened a "[p]ubli
outlets," and "[d]irect contact with the Saud
reconsider their financial support for the Ki

100. The conspiracy campaign maintained and circulated a running dossier branding Dr. Saeidi an agent of the Iranian government.

101. From May-December 2025, Bazargan contacted a broad range of faculty members from the University of Arkansas, Cambridge University, and George Washington University, including the Jewish Studies Program at Arkansas, about Dr. Saeidi. In her

communications, she accused Dr. Saeidi of antisemitism and asked if Dr. Saeidi condemns Hamas.

102. On July 10, 2025, through prior counsel, Dr. Saeidi served cease-and-desist demands on Bazargan and on AAIRIA's chief fin tortious interference. The campaign did not stop.

103. On September 29, 2025, Bazargan emailed a research ethics complaint to the University of Cambridge alleging fabrication Cambridge doctoral dissertation and her Cambridge University Press book, *Women and the Islamic Republic*, to further tarnish Dr. Saeidi's academic reputat Bazargan shared this email with Chancellor Robinson.

104. In furtherance of the conspiracy, Bazargan solicited and deployed accusatory statements from third parties, including letters drafted by Bazargan but that Bazargan misrepresented were from former Iranian political prisoners accusing Dr. Saeidi of fabricating or misattributing interviews in her Cambridge dissertation and her Cambridge University Press book, which Bazargan then provided to the University's go

105. Indeed, the #FireSaeidi campaign pressed its accusations to the University's governing Board directly. On October 23, 2025, Bazargan emailed Board of Trustees members individually, Chancellor Robinson, and Dr. Sa continued Misconduct of Dr. Shirin Saeidi and the University's Failure to

106. On November 20, 2025, she emailed every member of the Board again and accused Dr. Saeidi of plagiarism; she demanded the Board of Trustees review "the circumstances surrounding [Dr. Saeidi's] appointment as the Director of the King Fahd Center for Middle East Studies."

107. In that email to the Board, she explicitly states that the Arkansas Legislature's decision to request MEST syllabi "did not happen in a vacuum." Rather, "it is a direct consequence of Chancellor Robinson's repeated we have brought forward over many months" reg

108. In a December 5, 2025 public audio broadcast, Bazargan stated the campaign's objective plainly: all that mattered was that Dr. Saeidi be fired.

109. On that same date, Bazargan emailed every member of the Board of Trustees, copying Dr. Saeidi. In her email, Bazargan lodged a plagiarism accusation against Dr. Saeidi and once again demanded that the Board review "the circu appointment and advancement at the institutio

110. In late December 2025, Bazargan publicly called on people in Arkansas to support the #FireSaeidi campaign through to completion.

**E. Dr. Saeidi sought aid and protection from the University from her harassers.**

111. On May 4, 2025, Dr. Saeidi wrote to Cha IX office, and the University police departme harassing, and trying to intimidate me online and offline due to a testimony that I submitted to a high-profile and controversial trial in Sweden i

112. On May 11, 2025, she wrote to Senior Vi equal opportunity compliance office ("OEOC"), the human resources office. She reported that Bazargan "is inciting violence against m to 'execute' me 'like the ...' ... charge them ... terrorist if I don't respond." She wrote: "I

scholarship, and service. It can't be okay." and protect the university."

113. No University official ever responded to these reports. The University never investigated any person Dr. Saeidi reported. Office of Equal Opportunity to Dr. Saeidi, was that the off-campus campaign was outside its jurisdiction. As alleged below, it then investigated Dr. Saeidi on allegations initiated by persons with no University affiliation, despite Arkansas law requiring that complainants have an affiliation to the University.

114. In approximately August or September of 2025, Dr. Saeidi attended a faculty meeting alongside other members of her department. During that meeting, Dr. Saeidi disclosed to William Schreckhise, as the chair of her department, that she was having an adverse mental reaction, akin to PTSD, to the increase in requests for communication, oversight, and calls directed to her by Dean Raines and then-Assistant Dean Chris Schulte. Despite the concerning nature of this admission, William Shreckhise took no action to support or assist Dr. Saeidi following her disclosure.

115. As AAIRIA's campaign to #FireSaeidi gai Dr. Saeidi escalated, Dr. Saeidi's depression

**F. As external pressure mounted, the University began building a case against Dr. Saeidi.**

116. The same month, the University developed a case to punish Dr. Saeidi for her exercises of free speech, relying on allegations from the #FireSaeidi campaign.

117. As noted in Board Policy 1004.1, Chance authority thereon, subject to the policies es to take action to support Dr. Saeidi, the campus

one of his primary duties. In spite of his duty, he chose to ignore what was happening to Dr. Saeidi and the severity of the campaign that was being waged against her. His only actions were to direct others (namely Dean Raines and Provost Jim Gigantino), pursuant to his executive capacity, to turn the University's scrutiny against Dr. Saeidi as AAIRIA traction.

118. Chancellor Robinson reports to University President Jay Silveria for "enforcement of the policies and procedures, Trustees concerning that [University of Arkansas – Fayetteville] campus." There is no evidence that President Silveria intervened to fulfill his duty to oversee the work being performed by Chancellor Robinson as it relates to the "wel Saeidi's welfare.

119. In May 2025, Vice Chancellor Gigantino ordered University administrative staff to pull Dr. Saeidi's conflict-of-interest and outside-employment records for the preceding three years for review despite her spotless University record.

120. On July 1, 2025, weeks after Dr. Saeidi demands that the University investigate her, Dean Raines issued a retroactive written warning about her 2023 use of University letterhead in the Swedish court submissions.

121. Associate Dean Chris Schulte sent Raines the pre-drafted letter on June 27, 2025. Schulte wrote that he had "reviewed the lette recommendation is that you be the one to send

122. During the testimony provided by Dean R 2026 faculty hearing regarding her dismissal, he stated that he only became aware of the letterhead issue after it was brought to his attention by Chris Schulte. He admitted that he "didn'

particulars of the [Hamid Nouri] trial” or “h letters were a “fairly normal scholarly engagement with appropriate disclaimers.”

123. In fact, when Dr. Saeidi notified her faculty colleagues of her termination from her MEST director position over email, University professor emeritus Dr. Ted Swedenburg responded via email that it was routine for faculty members to use university letterhead in legal cases.

124. In that same email, Dr. Swedenburg noted that he had served as an expert witness 4 or 5 times while at the University, adding “when a professor appears as an expert witness in a legal case, it is typically the case that the expertise that is sought by the legal team is very much a product of one’s university position and professional expertise.” He further stat could not “imagine why sending a letter to the court on letterhead should be a problem.”

125. The conduct addressed in the warning letter predated Raines’ own the University. The potential conflict had been disclosed in 2023 and approved in 2024 through the method of reporting that complied with the university’s policies

126. Nine days after the warning came AAIRIA demanding an investigation into Dr. Saeidi’s letterhead use i had just reprimanded Dr. Saeidi for.

127. In early July 2025, Dr. Saeidi, through previous counsel, opposed the warning letter in writing. Counsel told Dean Raines that “ reactive to a coordinated smear campaign by Lawdan Bazargan and AAIRIA.” Co that if the University “intends to act on ano

also consider the harassment Dr. Saeidi is enduring, the discriminatory nature of these attacks, and the chilling effect such warnings will ha

128. During Dr. Saeidi's faculty hearing, De "peripherally aware" of the #FireSaeidi campa Saeidi's multiple reports to him regarding AA

129. On August 6, 2025, Dr. Saeidi filed a formal internal discrimination complaint with the OEOC against Dean Raines, Case #00103-2025. The complaint documented disparate treatment based on her national origin and religion. She adopted and supplemented it in a September 19, 2025 investigator interview.

130. Two weeks later, on August 20, 2025, De office an email asserting that Dr. Saeidi and her social media posts were antisemitic. Dr. Saeidi had reported Weinthal to the University by name on May 11, 2025 for harassment.

131. On August 21, 2025, Chancellor Robinson, via his chief of staff, referred the email to Jim Gigantino, requesting that Weinthal's investigated. Chancellor Robinson chose to begin an investigation into Dr. Saeidi, despite his awareness of her ongoing harassment by Weinthal and the AAIRIA.

132. On August 22, 2025, Gigantino asked Danielle Williams, the Associate Vice Chancellor and Executive Director/Compliance Officer, to have her team review Weinthal's allegations under the campus non-discrimination policy as updated to reflect Arkansas Act 721, in spite of the Act's provision that states that on education" and "faculty and staff employed by to make a complaint for discrimination or harassment.

133. The OEOC complaint was based solely on the antisemitism accusations made by Defendant Weinthal in his email to Mark Rushing.

134. On August 23, 2025, Mark Rushing, responded to Benjamin We email, stating "Received your messages and in with university policies."

135. On August 27, 2025, Mark Rushing supplemented his email response to Weinthal, stating "this [the antisemitism allegation ag university policies."

136. Sixteen days after Dr. Saeidi complained of discrimination by the Dean, the University converted her reported harasser's Saeidi herself.

137. Arkansas State Senator Dan Sullivan joined the #FireSaeidi campaign in its final phase. He is Vice Chair of the Senate Education Committee, which advanced Act 721, the antisemitism statute; a member of the Joint Budget Committee, which considers the appropriation bills that fund the University; and the sponsor of Act 116 of 2025. On or about November 10, 2025, he requested, through the Bureau of Legislative Research, the syllabi of nine courses linked to the Center Dr. Saeidi directed. The University received the request on November 12, and on November 17 the Dean ordered her to produce her syllabi by 9:00 that morning, writing that "as employees of the state of Arkansas we do not have discretion in this matter."

138. On November 20, 2025, a Bazargan emailed a letter entitled "Legislati Intervention Following the University's Failu Shirind Saeedi Saeidi" to the University's Board of T This communication was circulated

internally among the University's senior admi Chancellor Robinson, Bill Kincaid, Jim Gigantino, David Curran, Vice President for Legal Affairs, as well as Jay Silveria, University of Arkansas System President.

139. On that same date, the AAIRIA sent a letter to the Arkansas legislature, thanking them for exercising oversight over Dr. Saeidi.

**G. The University OEOC Office initially found that Dr. Saeidi's posts were not antisemitic.**

140. On November 24, 2025, the OEOC Officer CJ Moseby resolved the Weinthal-initiated review in Dr. Saeidi's favor. After found that her posts did not violate the Univ

141. In fact, the OEOC stated in their lette she has engaged in adverse action or adverse treatment against any individual based on an individual's actual or perceived association protected class, in other words, due to antisemitism.”

142. The OEOC further stated in their letter declarations that she has signed does not reflect that she has expresse Jews, which may be expressed as hatred toward Jews.' Her criticisms State of Israel as an entity, rather than on Jewish people collectively.”

**H. The University punishes Dr. Saeidi for her protected speech.**

143. On November 27, 2025, Dr. Saeidi published a post on Twitter that was a prayer in relation to Iran's soon-to-be-assassinated Supreme Leader, Ali Khamenei. Khamenei is not only Iran's head of state; for millions of Sh ligious authority. That post became one of the grounds charged against her.

144. On November 27, 2025, while the American and Israeli governments were threatening to assassinate Ali Khamenei and his family, Dr. Saeidi posted a Persian phrase of a blessing, "may God protect you," about Khamen

145. On November 29, 2025, the University r individual with no connections to the University, who stated that he was "f Red Flag' indicator of Foreign Malign Influence regarding Dr. Shirin Saeidi" for h allegiance to Ayatollah Ali Khamenei and his concerns that she may be "sharing… technical data or university resources with sanctioned entities," engaging in "unreported foreign travel," or receiving "financial support from Iranian state-linked organizations." He furthered requested that the Office of Research Security "conduct an immediate audit of her."

146. On December 4, 2025, Dean Raines requested a meeting with Dr. Saeidi, despite knowing that she was traveling internationally that day to attend a conference in Doha, Qatar. His meeting request provided no context as to why it was necessary for Dr. Saeidi to meet with him.

147. In her December 4, 2025 email response to Dean Raines Saeidi asked for context around the meeting and requested that her attorney be present.

148. In Dean Raines' email response, he stated that the meeting was a personnel meeting in which attorneys are not allowed and that the meeting would be by Microsoft Teams if necessary.

149. In Dr. Saeidi's subsequent response, sh was about her director position, expressed exhaustion from travel and anxiety against her. She stated that she would not be able to meet that same day.

150. Dean Raines did not respond to Dr. Saeidi's last The next communication that Dr. Saeidi received from Dean Raines was an electronic letter the next day, stating that he was removing her from her position as Director of the King Fahd Center. This letter was shared with Dr. Saeidi approximately eleven days after the OEOC found antisemitism complaint against Dr. Saeidi to be meritless.

151. On that same day, Allen Phelps, the Uni email to Bill Kincaid, Margaret Sova McCabe, Jim Gigantino, Christopher Schulte, in which he noted that he was "following up" on a call th was planning to send an email response to the Export Control Violation Tip provider to ask him for more information regarding his concerns with Dr. Saeidi.

152. The day prior to Dr. Saeidi's removal, caid, coordinating attorney for the University's Office of General Counsel, had circulated a draft of the removal letter among Dr. Saeidi's supervisors.

153. On December 5, 2025, Law Professor Robert Steinbuch published an opinion piece in the Arkansas Democrat-Gazette entitled "Time for Actio references Dr. Saeidi's X posts, uses Dr. urges the University to disband the King Fahd Center in its entirety. Steinbuch's article also in Steinbuch solicited from President of the National Association of Christian Lawmakers and former state Senator Jason Rapert, who requests that the University immediately terminate Dr. Saeidi's employment.

154. At 9 AM on December 5, 2025, Kincaid forwarded the article by Steinbuch to Chancellor Robinson, Provost Indrajeet Chaubey, Rebecca Haley, Jim Gigantino, and Brian

Raines. This email was shared with the University's
notified of her removal from her position of MEST director.

155. The letter formally removing Dr. Saeidi as MEST director was emailed to her while she was in Doha for a University-approved conference. One of the Dean's stated re
for Dr. Saeidi's removal was "the disruptive impact on the
The same X posts referenced by the Dean were the very same posts that the University's ow
compliance office had found to not be antisemitic eleven days before with the exception of a December 4, 2025 tweet by Saeidi.

156. In Dean Raines' letter to Dr. Saeidi, h
matters involving Israel," but that her views
effects. Dean Raines further notes in his letter that Dr. Saeidi had "enthusiastically l
Khamenei, which Raines found "troubling given the position
Iran …"

157. On December 5, 2025, Bazargan sent a letter, "Urgent Concer
Antisemitism and Academic Misconduct by Unive
members of the Arkansas House and Senate, accusing Dr. Saeidi of antisemitism, alleging Dr. Saeidi has a connection to the Islamic Republic, and that she has plagiarized her research.

158. In a live Twitter Space on that same day, Bazargan stated during an interview that because Arkansas is a "red" state, was able to get by putting
her removed as Director of the King Fahd Center.[14]

159. On December 8, 2025, after receiving communications from Arkansas legislators regarding Dr. Saeidi, Haley, the University's Associate Vi

[14] https://x.com/AAIRIA_Org/status/1997032401395228772?s=20 [https://perma.cc/2JPZ-C2CA].

State Relations, promptly filed a complaint with the OEOC office against Dr. Saeidi. She wrote that she had “received . . . over the weekend that this needs to be investigated in accorda

160. The University’s investigator recorded post contained in Ms. Haley’s report by a leg Haley’s reference to state law as a reference

161. The complaint concerned Dr. Saeidi’s repost, without commentary, of a third party’s post. As the University’s faculty hea did not author the post, its emojis, or its hashtag. Her account carried a standing disclaimer: “Retweets are not endorsements, Views mine, not @Uarkansas. in the same thread that “[a]ttacking Muslims and illegal according to international law.”

162. On December 9, 2025, David Johnston, an Equal Opportunity & Title IX investigator with the University, informed Dr. Saeidi of the 2nd OEOC complaint against her via a formal letter and requested an interview with her, despite the fact Dr. Saeidi was still outside of the country.

163. On December 10, 2025, Mr. Johnston emailed Dr. Saeidi, st schedule an interview with Dr. Saeidi “no lat the matter,” even though he noted in the previou to a support person, but that the OEOC office would need two-day’s notice if a su was requested.

164. On that same date, Dr. Saeidi explained over email to Mr. Johnston that she was still under “intense off campus harassment” a

her attorneys, so she would need more context regarding the complaint before being able to meet with the investigator.

165. In response to Dr. Saeidi's email, Mr. Johnston chose to move forward with the investigation process without considering Dr. Saeidi's perspective or have provided regarding the X posts in question.

166. On December 10, 2025, Dr. Saeidi submitted a written complaint to Chancellor Robinson and Provost Indrajeet Chaubey: "You against Dean Raines." She described the remov tive created about my identity by an off-campus harassment group." answered the same The P evening. The removal, he wrote, was "within [ grievance procedure."

167. On December 15, 2025, five days after the second antisemitism complaint was submitted, the OEOC issued a report sustaining the Haley complaint. The investigation process took seven days from the submission of the initial complaint to the adverse finding against Dr. Saeidi. The Weinthal-inspired review of the same subject matter had taken three months and was ultimately dismissed. During the first investigation, the OEOC office had worked with Dr. Saeidi, providing her time and opportunity to respond in writing to the allegations made in the OEOC complaint rather than making a single request for an interview as Mr. Johnston had done.

168. The Haley complaint against Dr. Saeidi was streamlined. Upon information and belief, the OEOC had been given orders to complete their investigation as quickly as possible despite the university being on winter break and the fact that Dr. Saeidi was out of the country. Unlike the previous investigation, Shirin was only a single opportunity to meet with the OEOC investigator, David Johnston. When Dr. Saeidi requested more time before the interview to

ensure her attorney could also be present, her request was refused and she was informed that the investigation would continue without her.

169. On December 15, Bazargan emailed Dean Raines directly, calling for the termination of Dr. Saeidi.

**I. Raines recommends terminating Dr. Saeidi's**

170. On December 16, 2025, the day after the OEOC office issued an expedited finding of antisemitism against Dr. Saeidi, Dean Raines recommended Dr. cause based on the OEOC's finding that Dr. Saeidi

171. In his letter to Dr. Saeidi, Dean Raine with him in-person to discuss his recommendation, as preferred by the Board Policy 405.1, XI (c) (1). This statement was a misrepresentati Raines.

172. In Dean Raines' December 16th email to was "recommending-cause" Dr. Saeidi's dismissal for and that "the process." Later, Chancellor Robin Dr. Saeidi that describe formal proceedings were now being initiated t

173. Under Board of Trustees Policy 405.1, those proceedings include, on request, a hearing before a faculty committee. The commi President for decision. The policy provides t proceedings at any stage." At no point did the proceedings against Dr. Saeidi.

174. Under Board of Trustees Policy 405.1, IV.A.14, expressions of opinion related to faculty scholarship, however vehemently expressed, shall not constitute cause for dismissal.

175. On December 17, 2025, Chancellor Robins recommendation, effectively shirking his duty to monitor the actions of a Dean who is under his control. There is no evidence that Chancellor Robinson took the appropriate time to consider the fact that Dr. Saeidi had a filed an OEOC report previously against Dean Raines just three months prior to the Dean's termination recommendatio ignored all facts that in Dr. Saeidi's favor, including: the close timing of the second OEOC complaint against Dr. Saeidi compared to the first complaint, the fact that the sources of the OEOC complaints were from individuals with no University affiliation, the fact that an Islamophobic interest group with no University ties had been waging a harassment campaign against Dr. Saeidi for months, and the fact that her employee record with the University was spotless until August 2025 with the University-sponsored filing of the first OEOC complaint against her.

176. Rather, the Chancellor expedited his co recommendation. He issued notice of formal dismissal proceedings against Dr. Saeidi; he pro-actively chose to suspend Dr. Saeidi with pay and barred her from campus. He did this in spite of University of Arkansas Board Policy 405.1 tha circumstances exist which threaten harm or substantial disruption to the individual, to others, or to the University."

177. University of Arkansas Board Policy 405.1 further states that a suspension "determination shall be made by the chief exe Therefore, both Chancellor Robinson and President Silveria both chose to suspend Dr. Saeidi despite her having never harmed or threatened to harm any one person to their knowledge.

**J. Senator Sullivan directs the University to act against Dr. Saeidi.**

178. On December 19, 2025, Arkansas State Senator Dan Sullivan authored a public letter on behalf group of other state senators, supporting the University's decis

Dr. Saeidi. The letter invoked the Arkansas ACCESS Act, Act 116, and Act 721, and quoted her X posts to allege antisemitism against Dr. Saeidi. In his letter, State Senator Sullivan shows clear animus for Iran-, f osr teai tginn gn aitti oins" a.. "ah o"sr teigliem e n

dissent, executing political prisoners, and s

179. The letter was not a bill, a resolution, a committee report, or a request for information. It was not introduced, debated, or voted on in any legislative proceeding. The General Assembly was not in session.

180. The letter was about one person. It named Dr. Saeidi, misstated her position as "Assistant Professor," and described her conduct as "serious allegations against Assistant Professor Saeidi, including the misuse of university letterhead to advocate for the release of Hamid Nouri," and "questions regarding her research." It quoted her November 21 post on X that was addressed to the legislature and declared: "These unsubstantiated accusations by Assistant Professor Saeidi are inflammatory and may constitute a violation of Arkansas Act 721 of 2025." It quoted a translation of the December 8 repost and stated that it "raises serious questions about compliance with the state's antisemitism prohibitions."

181. The letter told the University what to do about her. It announced "this statement of strong support for the University of Arkansas's ongoing investigations," commended the administration "for prioritizing the integrity of our state's flagship institution over external pressures," dismissed the Middle East Studies Association's academic freedom objection as minimizing "the gravity of the allegations," invoked the Arkansas ACCESS Act, Act 116, and "Act 721 addressing antisemitism in public institutions," stated that the signatories "will not

stand idly by," and closed: "We are confident that the University of Arkansas will complete its investigation thoroughly and impartially and take whatever actions, if any, are appropriate to the conclusions reached as a result of the inquiry."

182. Defendant Sullivan is Vice Chair of the Senate Committee on Education and a member of the Joint Budget Committee, which considers the appropriation bills that fund the University, and of the Legislative Joint Auditing Committee. He is the sponsor of Act 116, one of the statutes the letter invoked against her. Act 721 provides that the General Assembly is encouraged to consider reducing or eliminating state funding of an institution found to inadequately address antisemitism complaints. Ark. Code Ann. § 6-16-2004(d)(2).

183. The letter followed Bazargan's December 5, 2025 email to members of the Arkansas House and Senate, "Urgent Concerns Regarding Antisemitism and Academic Misconduct by University of Arkansas Faculty Member." After the letter was released, AAIRIA publicly thanked the legislature for acting on its concerns about Dr. Saeidi.

**K. University committee hears testimony and unanimously recommends Dr. Saeidi for reinstatement.**

184. On January 6, 2026, Dr. Saeidi invoked her right under University policy to request a hearing on her recommended dismissal. She asked that it also address her suspension, her removal as Director, and all related disciplinary findings. On January 7, 2026, Chancellor Robinson confined the hearing to the dismissal alone. He noted that Dr. Saeidi
not be a part of the hearing" and that her re
subject to review." His letter also barred di
depositions. The adverse actions already taken were placed beyond the reach of any reviewing body.

185. On January 14, 2026, the Foundation for Individual Rights and Expression wrote Chancellor Robinson that the posts and testimony at issue were protected private-citizen speech on matters of public concern and demanded that the charges be dropped.

186. On February 23, 2026, the University's Committee, composed of eight senior professors, convened under Board Policy 405.1 to hear Dr. Saeidi's case.

187. At that hearing, testimony was taken from Dean Raines, Chancellor Robinson, and Dr. Saeidi.

188. During Brian Raines' referred to Ali Khamenei as a dictator who targets his own citizens" and th Dean Raines further testified that he found Dr. Saeidi's speech regarding Ira," citing the U.S. sanctions of Iran as his basis for Dr. Sae, in addition to "their broader con about the state of Iran, its treatment of its

189. Dean Raines further admitted in his tes directly related to Dr. Saeidi's removal as M Hamid Nouri trial. He also noted that Dr. Sae very fitting "create an atmosphere that would be difficult for s views on the Middle East."

190. Regarding Dr. Saeidi's December 4 retweet that was the basis for the second OEOC complaint against Dr. Saeidi, Dean Raines testified that he found retweet was calling for a "brutal act of violence against the Zionists" as "an appeal to

191. He further stated that he found the posts to be discriminatory because of the "close proxy between Zionists and Jewish people," stating that "people who are going to kill

Zionists are targeting Jews . . . .” Zionist is often used as a close proxy for When Dean Raines was asked by University counsel Bill Kincaid if “Many Zionists are Raines responded “yes, of course” while also Zionists but not Jewish.” He stated that he u However, he “predicted” that “a Jewish person hears a cal that they might fear for their lives “even th

192. Dean Raines went on to state his concerns as to how the University of Arkansas would be perceived by continuing to employ Dr espousing these assertions of views.” Dr. Saeidi’s te

193. During his testimony, Dean Raines indicated that he believed the contents of Dr. Saeidi’s X profile, even if private or otherw been reason enough for him to dismiss her from her MEST director position.

194. Chancellor Robinson testified before the faculty hearing that he concurred with Dean Raines’ finding that Dr. Saeidi had viol, which led him to suspend Dr. Saeidi from campus and initiate termination proceedings against her.

195. At the hearing, Chancellor Robinson was asked specifically if he believed Dr. Saeidi’s social media posts would cause “disruption” on camp In response, he stated that her posts already had caused disruption because the University had already heard from state officials about her, which was a “cause for conce

196. On February 27, 2026, the committee unanimously rejected all six of the charged grounds used to justify the recommendation fo “does not constitute a violation of the Unive discriminatory harassment.” It found the repo

Jewish or Zionist people or a call for violen
had complained of feeling threatened. It found that court testimony on University letterhead is
“not outside the norm.” It concluded that “th It does not rise to the level of
dismissal.” It recommended that Dr. Saeidi “b
responsibilities as a tenured Associate Profe

197. On March 10, 2026, after the 8 to 0 recommendation and while President
Silveria’s decision was pending, Bazargan wro
System and copied approximately seventy academics in her email. The letter announ
formal complaint submitted to Cambridge Unive
urged the University to withhold Dr. Saeidi’s basis of it.

**L.** President Silveria terminates Dr. Saeidi’s

198. On March 26, 2026, System President Silveria rejected the unanimous
recommendation of the University’s own hearin
terminate: “your employment will be terminate
business days.” President Silveria decision [Equal Opportunity, Compliance &
Title IX Office]’s findings and the reasons discussed i

199. Despite his control and discretionary authority over the University campus, President Silveria failed to exercise his authority to order that Dr. Saeidi be reinstated to her previous position. Rather, he rubber-stamped the OEOC findings relied on by both Dean Raines and Chancellor Robinson while ignoring the un
favor.

200. His decision also cited the University’
721, Ark. Code Ann. § 6-16-2104(d)(2), and federal Title VI antisemitism enforcement.

201. Dr. Saeidi appealed President Silveria’

202. On May 20, 2026, Dr. Saeidi’s Counsel a presented brief oral arguments to the Board of Trustees on as part of the Board-set meeting agenda.

203. Given that Dr. Saeidi’s termination was President Silveria, he was responsible for en provided to the Board members and sufficient time for thoughtful discussion before decisions are required” pursuant to Board Policy 405.1. Giv decision on Dr. Saeidi’s appeal, there is no there was appropriate time and materials before the Board to review Dr. Saeidi’s

204. The Board considered Dr. Saeidi’s case for a few mi were presented before upholding Dr. Saeidi’s widespread attention of her case and previous unanimous vote on her behalf during the faculty hearing.

205. Under the University’s May 20th decision was g polici final and the termination became effective that day.

206. Bazargan emailed Chancellor Robinson and others on May 18, 2026, and emailed the Board of Trustees and others on May 20, 2

207. Bazargan publicly gloated about Saeidi’s termination, and took credit for it, writing the #FireSaeidi campaign, led by @AAIRIA_Org and dozens of volunteers who helped, resulted in her dismissal from the un *See Figure 1.*

**M. The Agreement to #FireSaeidi.**

208. Bazargan and AAIRIA, Weinthal, Senator Sullivan, and University officials Raines, Robinson, Gigantino, and Silveria reached an understanding to remove Dr. Saeidi from her directorship and from her tenured position because of her speech, her faith, and her Iranian origin. The understanding formed in stages between May 2025 and December 2025. Each of them knew of the #FireSaeidi campaign's objective, and each acted to carry it out.

209. The officials knew the object because the campaign told them. Bazargan and AAIRIA wrote to the Chancellor on March 24, April 25, May 1, and July 10, 2025; to the Board of Trustees on October 23, 2025, on November 20, 2025, and on December 5, 2025; to the System President on March 10, 2026; and to the Chancellor and the Trustees on May 18 and May 20, 2026. Those letters demanded that Dr. Saeidi be investigated, removed, and dismissed.

210. Each demand was followed by the act it demanded:

(a) In May 2025, the campaign demanded an investigation of Dr. Saeidi, and Weinthal asked the University whether it would open an investigation into Saeidi. That same month Gigantino had Dr. Saeidi's records pulled. On July 1, 2025, Raines issued a warning over her 2023 conflict of interest submissions.

(b) On August 20, 2025, Weinthal emailed the University accusations that Dr. Saeidi was antisemitic. Robinson, through Jim Gigiantino, referred the accusations to the OEOC office on August 22. The complaint consisted solely of Weinthal's accusations. The University kept Weinthal updated on the actions they were taking against Dr. Saeidi, the very actions he prompted.

(c) On November 20, 2025, Gigantino forwarded a letter from Bazargan to Raines and Schulte within thirteen minutes of receiving it. The same day Bazargan wrote to the Trustees under the title "Legislative Intervention Following the University's Failure to

Address Serious Concerns regarding Dr. Shirin Saeidi. "That letter circulated among Robinson, Gigantino, Silveria, and the University's lawyers.

(d) On December 5, 2025, Bazargan wrote to every University Trustee about Dr. Saeidi. That day Raines removed Dr. Saeidi as Director, in a letter that the University's counsel had circulated in draft the night before and that reproduced the campaign's accusations.

(e) On or about December 8, 2025, the University's liaison to the legislature filed a complaint against Dr. Saeidi that came from "a legislative source. "On information and belief, the post reached the legislature from the AAIRIA campaign, which had been supplying Dr. Saeidi's name and its accusations to Arkansas legislators since April 2025. The University sustained the complaint in seven days.

(f) At 3:00 a.m. on December 15, 2025, Bazargan emailed Raines. At 5:17 a.m. he forwarded her message to Donna Johnson, the Assistant Dean of People Operations, and to Associate Dean Schulte. He recommended dismissal the next day.

(g) On December 17, 2025, Robinson concurred in the recommendation and suspended Dr. Saeidi. The same day the New York Post published an article by Weinthal, on information and belief sourced to AAIRIA, reporting the plagiarism complaint AAIRIA had filed.

(h) On December 19, 2025, Sullivan wrote to the University on Senate letterhead. His letter repeated the campaign's accusations and invoked Act 721, the statute under which the legislature is encouraged to cut an institution's funding. AAIRIA publicly thanked the legislature for their university intervention regarding Dr. Saeidi. On March 10, 2026, Bazargan wrote to Silveria urging that Dr. Saeidi not be reinstated. On March 26, 2026, Silveria terminated her, relying on the legislators' letter and the funding statute.

211. These acts were not independent. Four facts show agreement.

212. First, Bazargan knew what the University would do before it did it. On December 11, five days before any recommendation, she announced that the process to dismiss Dr. Saeidi had begun. On December 14 she corrected a news outlet: Dr. Saeidi had "not yet been fully terminated." No recommendation for termination had been made yet and none had been announced. On information and belief, a University official, or a legislator in contact with University officials, told her.

213. Second, the communication ran in both directions. The University reported to Weinthal in writing. Gigantino sent Bazargan's letter to the deciding Dean within thirteen minutes. The Dean sent her 3:00 a.m. message to his personnel officers within hours of his recommendation.

214. Third, the University used the campaign's materials as its own. It relied on Weinthal's accusations as a University report. The removal letter reproduced the campaign's accusations from an internet search. Sullivan's letter restated them as the basis of the investigation.

215. Fourth, the University reversed its own judgment three times, each time in the direction the campaign demanded. It approved her 2023 disclosure and then disciplined her. Its compliance office cleared her after three months and then sustained a complaint in seven days. Its hearing committee voted 8 to 0 for her, and its President terminated her. Every complaint the campaign made was investigated. Every report Dr. Saeidi made about the campaign was ignored.

216. University officials had a reason to agree to take action against Saeidi. The campaign took its accusations to the legislators who control the University's funding. Act 721 encourages the General Assembly to reduce or eliminate the funding of an institution found to

have inadequately addressed antisemitism complaints. Sullivan sits on the Joint Budget Committee, and his letter invoked Act 721. President Silveria's decision cited the University's funding exposure under that statute.

217. The agreement was not among agents of one institution. It joined a private California organization and its leader, a writer with no tie to the University, a state senator, and officials of the University.

218. Sullivan joined the agreement between November 10 and December 19, 2025. On or about November 10 he requested the syllabi of courses linked to Dr. Saeidi's Center. On November 20, AAIRIA thanked the legislature in writing for exercising oversight over Dr. Saeidi. On December 5, the campaign sent its Saeidi accusations to members of the Arkansas House and Senate. Within days, a "legislative source" sent Dr. Saeidi's repost to the University's liaison to the legislature. On December 19, Sullivan's public letter quoted a translation of that same repost and repeated the campaign's accusations: the 2023 letterhead, Hamid Nouri, and questions about her research. On information and belief, the legislative source was Sullivan or a legislator acting with him, and the campaign supplied the post and the accusations to him.

219. On information and belief, on or before May 9, 2025, Bazargan gave Weinthal AAIRIA's letter to the University and its accusations against Dr. Saeidi, and the two agreed that he would press the University for an investigation and publish the accusations. His May 9 inquiry cited AAIRIA's letter. He shared the campaign's petition. On December 17, 2025, he published the plagiarism accusation AAIRIA had filed. He has written repeatedly about Iranian academics targeted for removal, with Bazargan and AAIRIA as his sources. Bazargan has said what the campaign did. She said that by putti

AAIRIA got her removed as Director. After the Board's vote she wrote that the campaign "resulted in her dismissal from the universit

220. On December 7, 2025, the day after Dr. Bazargan posted on X the following: "Fake Doc strings attached, fabricated interviews, and performance art.[15] Given that Dr. Saeidi has just been removed from her "Tick Tok" position as director, it appears the "Tick To recommendation for Dr. Saeidi's termination f until December 16, 2025, 9 days after Bazarga

221. On December 14, 2025, Bazargan corrected an Iranian media outlet on X that had reported that Dr. Saeidi had been terminated "Stop spreading misinformation and disinformation... She has not yet been fully terminated from her university position." Bazargan's post suggests insider knowledge that Dr. Sae immediately forthcoming.[16]

222. The investigation that supplied the ter any complainant of record. It came through th Rebecca Haley, relaying "a legislative source" and inv

223. The University adopted the #FireSaeidi campaign's narrative in disciplinary documents.

224. The timing moved in lockstep. The remov email to every Trustee. The dismissal recommendation came the day after Bazargan's 3:00 a.m

[15] https://x.com/LawdanBazargan/status/1997727187970203679 [ https://perma.cc/SC5U-LXE3].
[16] https://x.com/iraninarabic_ir/status/2000138312472760794 [https://perma.cc/9AC4-LWS4].

email to the Dean. The concurrence came the s
the New York Post.

225. By the fall of 2025, the campaign was functioning as the evidentiary apparatus of the University's proceedings against Dr. Saei
and, on information and belief, the X post that the University's leg Title IX complaint reached the legislature from the AAIRIA campaign, which had been supplying Dr. Saeidi's name and its accusations to Arkansas
materials became the University's evidence: t
accusations from the Dean's plan to charge Saeidi with The campaign's
antisemitism became the basis for ousting Dr. Saeidi, while University's campaign's stat
frame became the University's stated complian
receive the campaign's accusations against Dr. Saeidi. Those accusations became the bases upon which Dr. Saeidi was punished for her protected speech. This was amplified and coordinated by each Defendants with each other and accelerated by the actions of Defendant Sullivan who used his office of the Senate to reach agreement in line with the objectives communicated by Weinthal and Bazargan.

226. The officials did not independently evaluate the accusations they acted on. The one time the University evaluated the same subject matter independently, the review took three months and exonerated her. When the University acted against her, it acted on the campaign's say-so, with coordinated pressure from Defendant Sullivan: a Google search of t own accusations offered as evidence in the removal letter; a seven-day complaint-to-finding process; a dismissal recommendation whose entire indexed record was that finding and five University Board policy texts; and a termination decision that expressly rested on those

accusations in coordination with Defendant Sullivan' while rejecting the unanimous recommendation of the only body that had independently evaluated the evidence. Substituting the campaign's judgment for the State's own, is the mark of joint action, not of positions it independently assessed.

**N. The #FireSaeidi campaign has continued beyond University.**

227. In late September or early October of 2025, AAIRIA submitted a formal complaint to the University of Cambridge Press, claiming that Dr. Saeidi "fabri with former political prisoners, including Ms. Maryam Nouri, who is quoted in the book but has stated she was[17] never interviewed."

228. On December 13, 2025, the AAIRIA published a press release on their website and on X stating that Dr. Saeidi "fabricate[d] interviews with Iranian political prisoners whose actual testimonies are the backbone of" histor AAIRIA further stated that their "independent uncovered patterns of fabrication, misuse of survivor testimony, and unauthorized claims of interviews with former political prisoners, including Maryam Nouri, Monireh Baradaran, Nazli Partovi, and Nasrin Parvaz" in Dr. Saeidi's stated that those women … claims that Dr. Saeidi interviewed them.[18]

229. To Dr. Saeidi's knowledge, AAIRIA has never contacted Dr. Saeidi to check their accusations against the documentation and informati

230. On December 17, 2025, Dr. Saeidi published on her public Instagram page emails evidencing that she had met Maryam Nouri, one of the Iranian women she interviewed for her

---

[17] https://x.com/AAIRIA_Org/status/1975280386948407605 [https://perma.cc/NQH9-PD3Z].
[18] https://x.com/AAIRIA_Org/status/1999927004481925631 [https://perma.cc/8L8L-SNN8].

dissertation and her subsequent book. She pub
complaint to Cambridge, submitted on behalf of Maryam No
the slightest hesitation that [Maraym Nouri]

231. On information and belief, AAIRIA and B
Instagram and know that the fabrication allegations rega
false.

232. Despite this, AAIRIA and Bazargan have continued publishing content that states that Dr. Saeidi fabricated her dissertation interviews.

233. AAIRIA's posts offer no references to t
Cambridge University Press have not completed
against Dr. Saeidi. Nor do these posts note that any findings of plagiarism or other falsehoods have been sustained in Dr. Saeidi's academic

234. On March 31, 2026, AAIRIA posted on X that "form
testimonies were cited in Saeidi's work came
interviewed by her. Some of the individuals named in her research have been found to be non-existent. These findings raise serious concerns that her dissertation and subsequent book are not grounded in legitimate research, but instead reflect a combination of plagiarism and fabricated material, produced in alignment with narrativ
apparatus."[19]

235. On June 3, 2026, Defendant AAIRIA posted on X[20] that "multiple former political prisoners raised serious concerns regarding Saeidi's dissertation and book. Several individuals publicly stated that they had never given interviews to Fake Doctor Saeidi and had

[19] https://x.com/AAIRIA_Org/status/2038923942199456030 [https://perma.cc/3CRK-NWGL].
[20] https://x.com/AAIRIA_Org/status/2062201895347998793 [https://perma.cc/SZ9J-PK8J].

never had meaningful interactions with her. According to their accounts, Saeidi relied on publicly available sources, including memoirs, published writings, and online materials, while presenting certain statements and narratives as though they had been obtained through direct interviews with them. "

236. AAIRIA's posts do not mention the fact that Cambridge University and Cambridge University Press have not completed

against Dr. Saeidi. The posts also omit that Cambridge has yet to sustain any findings of plagiarism or other falsehoods against Dr. Saeidi in her related academic case.

237. On August 15, 2026, AAIRIA posted on X[21] the fo [f]ormer Iranian political prisoners Maryam Nouri, Nasrin Parv

representations of their experiences and interactions with her. These are women who endured the Islamic Republic's prisons, torture, solitary separation from their children, and the loss of loved ones. The allegations concern whether their experiences and memoirs were accurately represented, whether purported interviews occurred, and whether appropriate research practices were followed."

238. To date, Defendants Bazargan and AAIRIA have continued pursuing plagiarism and fabrication accusations with Cambridge University and Cambridge University Press regarding Dr. Saeidi's dissertation and book.

**INJURY**

239. The campaign and the termination it pro

and standing. She lost her tenured position, her salary and benefits, and her directorship and its compensation. She was excluded from her campus. Her professional reputation, the foundation

[21] https://x.com/AAIRIA_Org/status/2088641110298304679 [https://perma.cc/HS6U-H87F].

of an academic career in teaching, publishing, grants, invitations, and appointments, was gravely injured: her degree-granting university and her publisher each opened review proceedings concerning her scholarship. She continues to suffer from severe emotional distress, PTSD, depression, humiliation, and fear for her safety and

240. The actions taken by Defendants have also caused financial harm to Dr. Saeidi. Due the campaign's branding of her as antisem remains unable to be employed in academia. While she previously purchased a home in Fayetteville, Arkansas while employed at the University, her financial circumstances have forced her to relocate to Virginia to be nearer to family who can assist her with expenses and childcare while she is unemployed.

241. Since being terminated by the University, Dr. Saeidi has lost her health insurance and her access to various health services, adversely effecting her well-being.

## CAUSES OF ACTION

### <u>COUNT I</u>
### 42 U.S.C. § 1983: First Amendment Retaliation
*(Against Defendants Raines, Robinson, Gigantino, Schulte, Silveria, and Sullivan)*

242. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

243. Dr. Saeidi's expert submissions to a fo were speech by a private citizen on matters of public concern: the conduct of a foreign government, a matter of historical and scholarly debate, and the politics of an ongoing war. None of it was speech pursuant to her official dut reviewed the postings and found them not to be discriminatory in nature. The University hearing committee unanimously found the charg

Board policy provides that expressions of opinion related to scholarship, however vehemently expressed, shall not constitute cause for dismissal. The University was warned in writing, before the hearing, that the speech was constitutionally protected.

244. Raines, Robinson, Gigantino, Silveria, and Sullivan agreed with Bazargan, AAIRIA, and Weinthal, each committed overt acts in furtherance of the agreement. Those acts cost Dr. Saeidi her directorship and her tenured position. Each is liable for the acts done in furtherance of the agreement.

245. Each Defendant, alone and together, took adverse action against Dr. Saeidi because of that speech. Raines issued the retroactive July 1, 2025 warning letter regarding the Dr. Saeidi's 2023 use of University letterhea
Dean Raines removed Dr. Saeidi from her directorship on December 5, 2025, and recommended her dismissal on December 16, 2025. Gigantino directed the records pull, procured the warning letter, and converted her reported harasser's
Robinson routed that investigation, concurred in the dismissal recommendation, suspended her, barred her from campus, and confined the scope of her hearing. Sullivan's demand and his December 19 letter, viewed in context, conveyed a threat of adverse state action to punish Dr. Saeidi's speech, and the University so understood them. The President cited the letter as the reason his prediction of disruption was reasonable and cited the funding statute the letter invoked as a reason for the termination. The University's counsel told the Board that the University faced "loss of funding." Silveria rejected the unanimous recommendation of the hearing committee and terminated her.

246. Each of those actions would chill a person of ordinary firmness from continuing to speak. The ban from campus was itself a concrete punitive consequence of that kind.

Defendants' actions in fact chilled and restr and participation in her own defense.

247. Any claim of workplace disruption fails compliance office investigated the postings for three months and found no policy violation. Its hearing committee of eight senior professors found that no student or colleague had complained of feeling threatened. The only disturbance in this record is the noise of the campaign itself: outside letters, mass emails, procured press, and legislative pressure demanding that she be punished. A public employer may not treat an outside pressure campaign against protected speech as the disruption that justifies punishing the speech, and these Defendants did exactly that.

248. Each Defendant acted because of the speech and the campaign against it, not because of any legitimate ground. In his official letters addressed to Dr. Saeidi and during his testimony at the faculty hearing, Defendant Raines made it clear that he had an issue with the "viewpoint" expressed by Dr. Saeidi on the Mi her "fringe views" would be received by students share those views.

249. During Dr. Saeidi's termination hearing Robinson cited their concerns about how the U Saeidi's exercise of her speech and noted tha decisions to strip Dr. Saeidi of her MEST directorship and to terminate her employment. Dean Raines admitted during that same hearing that "praise of the Ayatollah "reason enough to remove her as MEST director.

250. These statements from the Defendants cl administrators were not concerned with antisemitism but with being able to filter what viewpoints and speech gets expressed by their faculty and staff.

251. The University's own processes had reje Silveria's decision expressly relied on the act recommendation, and, on information and belief, on the funding pressure constructed by the campaign and adopted by legislators. Whether the officials agreed with the campaign, or in the alternative yielded to it, the violation is the same. Outside pressure to punish disfavored speech aggravates the violation. It does not excuse it.

252. Counter to Ark. Code Ann. § 6-16-2105, the University, a state-supported institution of higher education, and its administrators impermissibly limited and restricted Dr. Saeidi's freedom of expression during her employment at the University.

253. Dr. Saeidi seeks compensatory, nominal, and punitive damages against these Defendants in their individual capacities, and reinstatement to her position from Defendant Silveria in his official capacity.

**<u>COUNT II</u>**
**42 U.S.C. § 1983: First Amendment - Free Exercise of Religion**
*(Against Defendants Raines, Robinson, Gigantino, and Silveria)*

254. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

255. The Free Exercise Clause of the First Amendment, applied to the States through the Fourteenth Amendment, forbids government from punishing religious observance and expression. A government employer may not discipline an employee for private religious expression.

256. Dr. Saeidi's November 27, 2025 post was a prayer. The Uni documents cited that prayer, and her devotional expression concerning a figure whom millions of Shia Muslims regard as a leading religious authority, among the grounds for discipline. Acting under color of state law, these Defendants burdened and punished her religious exercise. Their action was neither neutral nor generally appl policy violation, the University disciplined no comparable expression from adherents of other faiths, and the officials acted on the demands of a campaign whose leader, on information and belief, publicly describes Islam as a cult and not a religion.

257. Dr. Saeidi seeks compensatory, nominal, and punitive damages against these Defendants in their individual capacities, and reinstatement against Defendant Silveria in his official capacity.

**COUNT III**

**42 U.S.C. § 1983: Conspiracy and Joint Action Between Private Defendants and State Officials**

*(Against Defendants Bazargan, AAIRIA, Weinthal, Sullivan, Raines, Robinson, Gigantino, and Silveria)*

258. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

259. A private party who willfully participates in joint action with state officials acts under color of state law and is liable under 42 U.S.C. § 1983 to the same extent as the officials themselves. What is required is a meeting of the minds between the private party and officials with authority to act: a shared objective, pursued together. That understanding may be shown by circumstantial evidence, including communication between the private party and the officials about the plaintiff and her speech, the officials' adoption of the private party's materials and demands as their own, and the timing of the adverse actions against her.

260. The objective was shared. Bazargan and AAIRIA declared it in writing to the University's Chancellor, Dean, Trustees, and System President: that Dr. Saeidi be investigated, removed as Director, and dismissed. On May 2, 2025, Bazargan announced that AAIRIA would build a case that Dr. Saeidi was antisemitic. The University's officials then did what the campaign asked, relying the campaign's materials, on the campaign's timetable, and on the campaign's projected termination ground.

261. The campaign did not petition for a change in law or policy. It called for a disciplinary proceeding against one person: a compliance investigation, a removal, and a dismissal for cause. It supplied accusations it knew to be false, including that Dr. Saeidi fabricated interviews in her dissertation and book. Its stated basis for targeting her changed three times. It knew the outcome before the officials announced it.

262. **Bazargan and AAIRIA.** The agreement between the campaign and University officials is shown by the following facts, alleged in the Facts above:

(a) On November 20, 2025, Senior Vice Provost Gigantino forwarded Bazargan's letter to a Chronicle reporter, in which she claimed credit for removing four Iranian academics, to Dean Raines and Associate Dean Schulte within thirteen minutes of its arrival and forwarded her ‘Legislative Intervention ”demand to them the same evening.

(b) On December 5, 2025, the morning Bazargan wrote to the Trustees, Dean Raines removed Dr. Saeidi as Director, in a letter that reproduced the campaign's own search results and accusations.

(c) On December 11, 2025, five days before any recommendation to dismiss existed, Bazargan announced publicly that the process to dismiss Dr. Saeidi had begun.

On December 14, 2025, she corrected a news outlet that had reported Dr. Saeidi's termination, writing that she had "not yet been fully terminated."

(d) At 3:00 a.m. on December 15, 2025, Bazargan emailed Dean Raines directly about Dr. Saeidi. He forwarded her message to the College's personnel officers at 5:17 a.m. and recommended dismissal the next day.

(e) The University's charging documents adopted the campaign's narrative, its materials, and its statutory frame. The compliance finding on which the termination rested arose from a repost supplied through the University's legislative liaison after the campaign had written to legislators, and it invoked Act 721, the campaign's own frame.

(f) Bazargan wrote to the Chancellor and the Trustees in the days before and on the day of the Board's final vote, and after the vote she claimed credit for the dismissal in writing.

263. Bazargan acted at all times as AAIRIA's chief executive and as the campaign's principal actor, and AAIRIA acted through her. Each is liable for its own conduct and for the conduct of the other.

264. Weinthal joined the agreement alleged above and remained in it through the Dr. Saeidi's termination. He is liable for the acts his co-conspirators committed in furtherance of it, including the removal and the termination. His part is shown by his multiple emails to Vice Chancellor Mark Rushing and Chancellor Robinson between May and August of 2025, in which he badgers the University with allegations of antisemitism Dr. Saeidi and presses them on whether they will take action against her before he publishes an article about the University.

265. Once his antisemitism accusations become the basis for the first OEOC complaint against, Weinthal was given an insider update from Mark Rushing that Dr. Saeidi was being investigated; this is exactly what Bazargan enlisted him to support her with. As the University is performing an expedited review of the antisemitism allegations against Dr. Saeidi in December of 2025, Weinthal publishes two New York Post articles about Dr. Saeidi further escalating the University's concerns about avoiding negative
will view the University.

266. For reason of the foregoing, Bazargan, AAIRIA, and Weinthal were willful participants in joint action with University officials and acted under color of state law. They jointly caused the deprivations of Dr. Saeidi's First and Fourteenth Amendment rights alleged in Counts I, II, and IV, and they are liable under § 1983 for those deprivations to the same extent as the officials. As private parties, they have no qualified immunity. Dr. Saeidi seeks compensatory, nominal, and punitive damages against each of them.

267. Defendants Sullivan, Raines, Robinson, Gigantino, and Silveria were parties to the same agreement, as alleged in Part M, and are liable with them for the acts done in furtherance of it. Dr. Saeidi seeks compensatory, nominal, and punitive damages against each Defendant named in this Count, the officials in their individual capacities.

## COUNT IV

**42 U.S.C. § 1983: Denial of Equal Protection guaranteed by the 14th Amendment**

*(Against Defendants Raines, Robinson, Gigantino, Schulte, Schreckhise, and Sullivan)*

268. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

269. Acting under color of state law, these Defendants intentionally treated Dr. Saeidi differently because she is a Shia Muslim and because she is Iranian. They subjected her speech

and conduct to investigation and discipline that similarly situated faculty outside her faith and origin did not receive for like conduct. They credited and acted on complaints sourced from a campaign whose animus was explicit. They ignored her own reports of threats. They ran a seven-day process to sustain an antisemitism finding against her in stark contrast to the previous 3-month investigation. And they treated her faith and her religious expression as markers of disloyalty, crediting a campaign that attacked her expressly as a Shia Muslim. This purposeful discrimination denied her the equal protection of the laws in violation of the Fourteenth Amendment.

270. As alleged in Part M of the Facts, these Defendants agreed with Bazargan, AAIRIA, and Weinthal to subject Dr. Saeidi to investigation and discipline because she is a Shia Muslim and because she is Iranian. Raines and Robinson had been told in writing that the campaign's attacks were discriminatory, and they acted on them.

271. Dr. Saeidi seeks compensatory, nominal, and punitive damages against these Defendants in their individual capacities.

**COUNT V**
**Title VII: Discrimination on the Basis of Religion and National Origin**
*(Against the Board of Trustees)*

272. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

273. The unlawful employment practices charged in this Count are the decision to terminate Dr. Saeidi's employment, communicat

Trustees' final action of May 20, -2026-26. Each

02601.

274. The University terminated the tenured employment of its first Muslim Center director because of her religion and her national origin, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).

275. Title VII defines religion to include “ practice, as well as belief.” 42 U.S.C. § 200 Shia Muslim professor on grounds that included a prayer and her expression concerning a figure whom millions of Shia Muslims regard as a leading religious authority.

276. An employer is also responsible under Title VII for the acts of non-employees directed at its employees where it knows of the conduct and fails to take corrective action, considering the extent of its control and legal responsibility. 29 C.F.R. § 1604.11(e); *see id.* n.1 (the principles “continue to ap *accord* 29 C.F.R. § ace, c 1606.8(e) (same rule for national origin harassment). The University did less than fail to correct. It ignored Dr. Saeidi’s wr -lated harassment, and then ts of th adopted the campaign’s demands as its own per

277. The discriminatory character of the termination is established by the course of conduct that produced it: the Un -s of strangers to y’s in the University while refusing to investigate the threats she reported; the expedited, seven-day OEOC investigation that sustained antisemitism allegations against her; the disciplinary pattern alleged in the Facts; and the rejection of the unanimous finding of its own hearing committee that none of the six charged grounds supported dismissal. Those earlier acts are pled as evidence of the motive behind the charged practices, and not as independent claims.

278. Still, University officials made their animus for Iran, Dr. Saeidi’s c origin, quite clear. Over the course of his letters to Dr. Saeidi regarding her employment, Dean

Raines did not shy away from voicing his beliefs about Iran. He very openly stated that he believed the former Ayatollah, for which Shia Muslims like Dr. Saeidi consider to be a religious authority, a e“prressive dictator who targets his own

279. Dean Raines viewed Dr. Saeidi’s speech asked why he cited “the broader context about Dean Raines actively discouraged Dr. Saeidi f concern” and a “foreign adversary.”

280. Given the strong negative association Dean Raines has with Iran, he has imputed his animus of Iran onto Dr. Saeidi, an Iranian American.

281. Dean Raines held Dr. Saeidi to a heightened standard of scrutiny regarding her propensity for antisemitism by relying on and fostering common stereotypes that Muslims and Iranians are antisemitic. This is seen in his earliest in-person interaction with Dr. Saeidi, in which he chastises Dr. Saeidi solely for the hiring of Anti-Zionist, Israeli scholar. He chose to single out Dr. Saeidi, despite the hiring decision being a collaborative decision by both the Jewish studies department (headed by Dr. Jennifer Hoyer, a Jewish American woman) and MEST.

282. Dean Raines authorized and enforced the as MEST director in a disparate way, including when he requested that Chris Schulte attend MEST events to “take notes” on anything that

283. In Dean Raines’ testimony sympathized at Dr. Saeidi multiple points with the Jewish people’s long history of being subjected to discrimination and violence, referencing the Bondi Beach attack that occurred in Australia on December 14, 2025. This immense well of sympathy was limited only to Jewish persons. Dean Raines did not extend same kind sympathy to Iranians, Muslims, or people of Middle Eastern national origin who were

also being murdered in December of 2025 in various countries. He also offered no benefit of the doubt to Dr. Saeidi regarding her posts and her call for freeing Palestinians from genocide at the hands of Israel.

284. The termination caused Dr. Saeidi loss of pay, benefits, and professional standing, and emotional distress.

**COUNT VI**
**Title VII: Retaliation on the Basis of Religion and National Origin**
*(Against the Board of Trustees)*

285. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

286. The University of Arkansas terminated D

retaliation for her opposition to discrimination, in violation of Section 704(a), 42 U.S.C. § 2000e-3(a).

287. The discrete acts charged are the University's decision t

made and first communicated on March 26, 2026

upholding the termination and making it effective, on May 20, 2026. Each was charged in EEOC Charge No. 493-2026-02601.

**COUNT VII**
**42 U.S.C. § 1985(3): Civil Rights Conspiracy**
*(Against Defendants Bazargan, AAIRIA, Weinthal, Sullivan, Raines, Robinson, Gigantino, and Silveria)*

288. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

289. Bazargan, AAIRIA, Weinthal, Sullivan, Raines, Robinson, Gigantino, and Silveria conspired, as alleged in Part M of the Facts. The purpose of the conspiracy was to deprive Dr. Saeidi, either directly or indirectly, of the equal protection of the laws and of equal privileges and

immunities under the laws, because she is a Shia Muslim and because she is Iranian. The conspirators committed the acts alleged in Part M in furtherance of it. Those acts injured Dr. Saeidi in her person and property and deprived her of rights secured by the Fourteenth Amendment.

290. The rights the conspiracy was aimed at are the rights secured to Dr. Saeidi by the Fourteenth Amendment to the Constitution of the United States.

291. The conspiracy was driven by class-based, invidiously discriminatory animus against Shia Muslims and against persons of

statements about Islam, set out above, are statements about a faith and its practices. The campaign treated Dr. Saeidi's religious observance and

as evidence of duplicity, and the University charged her prayer as a ground for dismissal. The campaign's stated basis for targeting her cha beat three times while the target stayed the same. The

campaign's targets include Shia Muslim schola

That is a religious class and an ancestral class, not a political one.

292. Dr. Saeidi was targeted as a member of that class. The campaign branded her an agent of the Iranian government by reason of her faith and her ancestry. This Complaint does not question anyone's right to criticize the gove campaign's

of Dr. Saeidi, and its leader Bazargan's own

Iranians as such, for which the label “regime

before it was anything else.

293. The officials knew the campaign's purpose. In July 2025, Dr. Saeidi's counsel told Raines in writing that his warning appeared “

Bazargan and AAIRIA” and pointed to” “On Augus

2025, Dr. Saeidi filed a complaint of religious and national-origin discrimination. On December

10, 2025, she told Robinson that the removal created about my identity by an off-campus harassment group." Rai forward after that notice.

294. The State was involved in the conspiracy, and the aim of the conspiracy was to influence the activity of the State. The pri procure a state university's decision to remove Dr. Saeidi from her directorship and dismiss her from its faculty, and they pursued that object by directing their accusations to the University's Chancellor, Dean, Trustees, and System President and to Arkansas legislators. State actors joined the conspiracy: Defendant Sullivan, a state senator acting on Senate letterhead, and University officials who received the campaign's demands as alleged below.

295. University officials joined the conspiracy and acted in furtherance of it. Rushing filed the campaign's accusations as the University's own report and told Weinthal in writing that the matter was under review. Gigantino converted a reported harasser's accusations into an investigation of Dr. Saeidi, forwarded Bazargan's November 20 letter to Raines and Schulte within thirteen minutes of its arrival, and forwarded her legislative-intervention demand to them the same evening. Robinson routed Weinthal's allegations for investigation and, after the OEOC cleared her, concurred in dismissal on the same posts. Raines removed her as Director on the morning Bazargan wrote to the Trustees, received Baza it to his personnel officers within hours, and recommended dismissal the next day. Silveria, with the campaign's March 10 demand before him, ci invoked in terminating her. Every complaint the campaign made was investigated; every report Dr. Saeidi made was ignored.

296. In the alternative, and to the extent any University official did not join the agreement, Bazargan, AAIRIA, Weinthal, and Sullivan conspired among themselves. Neither Weinthal nor Sullivan is an officer or agent of AAIRIA. The aim of their conspiracy was to influence the activity of the State: to cause a state university to investigate, remove, and dismiss Dr. Saeidi. Each University official named in Count IX knew of that conspiracy, had power to prevent its object, and did not.

297. This Count does not seek to redress the deprivation of any right created by Title VII.

298. Defendants committed acts in furtherance: the communications, complaints, and investigations alleged above. Dr. Saeidi was injured in her person, property, and the exercise of her rights. She is entitled to recover damages from each conspirator.

**COUNT VIII**

**42 U.S.C. § 1983: Deprivation of Property and Liberty Without Due Process of Law under the 14th Amendment**

*(Against Defendants Raines, Robinson, Schulte, Schreckhise, Silveria, and Sullivan)*

299. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

300. As a tenured Associate Professor, Dr. Saeidi had a property interest in her continued employment, protected by the Due Process Clause of the Fourteenth Amendment. Board of Trustees Policy 405.1 permits dismissal of a tenured faculty member only for cause and only after the opportunity for a hearing.

301. Dr. Saeidi also had a liberty interest in her professional reputation and standing. The University's charging documents accused her of antisemitism and of alignment with a

foreign government and a designated terrorist organization. Those accusations were made in connection with her removal, suspension, and termination, and they became public.

302. Due process requires that the deprivation of these interests be preceded by notice and a meaningful opportunity to be heard before an impartial decisionmaker.

303. Defendant Raines was not impartial. When he removed Dr. Saeidi as Director on December 5, 2025 and recommended her dismissal on December 16, 2025, two discrimination complaints that Dr. Saeidi had filed against him were pending. The second had been filed six days before his recommendation. He improperly acted as the accused, the accuser, and the recommending official for Dr. Saeidi's proceedings

304. Defendant Robinson limited the scope of what could be discussed at Dr. Saeid faculty hearing. On January 7, 2026 he ruled that Dr. Saeidi's suspension "will not be a part of the hearing," that her removal as Director "is not subject to review." The adverse actions already taken against her were placed beyond the reach of the only body that would hear evidence.

305. Dr. Saeidi's removal as Director, her suspension, and her ban from the University campus were imposed upon her without any opportunity for her to challenge those decisions. The Provost told Dr. Saeidi in writing that her removal was "not subject to a grievance procedure."

306. The faculty hearing that was cleared Dr. Saeidi's name a Eight senior professors heard the evidence for a full day and rejected every charged ground, 8 to 0.

307. Despite this, Defendant Silveria contin terminate Dr. Saeidi "on the EO/TIX Office's findings and the reasons discussed in Dean Raines' letter."

308. These facts make it evident that Dr. Saeidi was deprived of her meaningful opportunity to be heard.

309. Acting under color of state law, Defendants Raines, Robinson, and Silveria deprived Dr. Saeidi of her property and liberty without due process of law.

310. Dr. Saeidi seeks compensatory, nominal, and punitive damages against these Defendants in their individual capacities, and reinstatement against Defendant Silveria in his official capacity.

**<u>COUNT IX</u>**
**42 U.S.C. § 1986: Neglect to Prevent**
*(Against Defendants Raines, Robinson, Gigantino, and Silveria)*

311. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

312. Section 1986 of Title 42 makes liable every person who, having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed, and having power to prevent or aid in preventing their commission, neglects or refuses to do so, if the wrongful act is committed.

313. Each of these Defendants knew of the conspiracy to #FireSaeidi as alleged in this Complaint under 42 U.S.C. § 1985(3). The campaign's letters and ema and received by them. Its November 20, 2025 legislative-intervention demand circulated among the University's senior administration. Lawsan Bazargan reached out to Dean Raines about Dr. Saeidi at 3:00 a.m. on the eve of his recommendation. AAIRI MA's March 10, 2026 letter went to the System President and urged that Dr. Saeid

314. Each of these Defendants had power to prevent the wrong or to aid in preventing it. Under Board of Trustees Policy 405.1, the administration may drop dismissal proceedings at

any stage. After the hearing, the decision belonged to Defendant Silveria, and the unanimous recommendation of the University's own reinstate hearin Dr. Saeidi's employment.

315. Each neglected and refused. Raines recommended dismissal. Robinson concurred, suspended Dr. Saeidi, and limited the scope of her hearing. Gigantino converted accusations into the investigation that suppl demand before him and an 8 to 0 exoneration i followed on May 20, 2026.

316. As to Defendants Raines, Robinson, Gigantino, and Sullivan, this Count is pled in the alternative: if any of them knew of the conspiracy and had power to prevent its object without having joined the agreement, he is liable under § 1986.

317. The wrongful acts were committed, and this action is commenced within one year after each cause of action accrued. Dr. Saeidi is entitled to recover all damages caused by the wrongful acts that these Defendants by reasonable diligence could have prevented, together with punitive damages against these Defendants in their individual capacities.

## COUNT X

**Defamation (Arkansas Law)**

*(Against Defendants Bazargan and AAIRIA)*

318. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

319. Bazargan and AAIRIA published to third persons, and republished through channels they selected, false statements of fact of and concerning Dr. Saeidi.

320. On September 29, 2025, Defendant Bazargan authored a complaint to the University of Cambridge accusing Dr. Saeidi of falsifying and/ or fabricated the interviews that she conducted for her dissertation.

321. The following written publications were made within three years before the filing of this Complaint, Ark. Code Ann. § 16-56-105(5) and are within the statute of limitations.

322. On March 10, 2026, Defendant Bazargan letter circulated allegations an email to approximately seventy academics, asserting that Dr. Saeidi fabricated or falsified interviews in her dissertation and in her Cambridge University Press book.

323. On March 31, 2026, AAIRIA published on X that "former polit whose testimonies were cited in Saeidi's work interviewed by her. Some of the individuals named in her research have been found to be non-existent. These findings raise serious concerns that her dissertation and subsequent book are not grounded in legitimate research, but instead reflect a combination of plagiarism and fabricated material, produced in alignment with narrativ apparatus."

324. Prior to making this post, AAIRIA and Bazargan had made many other posts on social media and publications via emails to university officials associated with Cambridge University and University of Arkansas in which they spread allegations of plagiarism against Dr. Saeidi.

325. Defendants published each statement with knowledge that it was false or with reckless disregard for whether it was false.

326. To Dr. Saeidi's knowledge, at no point Saeidi to check their alleged facts against D

evidence in her possession. This failure to investigate their allegations against Dr. Saeidi in good faith show reckless disregard on Defendants'

327. Dr. Saeidi published evidence on Instagram on December 17, 2025 directly contradicting the assertion that she had never met Maryam Nouri. At that point, AAIRIA and Bazargan, devoted viewers of Dr. Saeidi's soc their past statements were untrue and continued to publish the same allegations on social media and in their correspondence with Cambridge University.

328. Defendant AAIRIA and Defendant Bazargan Dr. Saeidi severe reputational damage within her profession, creating concerns from potential employers in academia that she is not trustworthy as an academic or researcher.

329. As a result of AAIRIA's and Bazargan's degree-granting university and her academic publisher each opened review proceedings concerning her scholarship on the strength of Defendants' ac the #FireSaedi campaign accusations in its own charging document and terminated her. She lost her employment, her directorship, and the professional standing on which an academic career depends, and she suffered emotional injury.

**<u>COUNT XI</u>**
**False Light Invasion of Privacy (Arkansas Law)**
*(Against Defendants Bazargan and AAIRIA)*

330. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

331. By the publications alleged above, individually and by their selection, juxtaposition, and orchestration, Bazargan and AAIRIA gave publicity to matters that placed Dr.

Saeidi before the public in a false light: as an operative of a foreign government, an academic fraud, and as a terrorist.

332. That false light would be highly offensive to a reasonable person. Defendants acted with knowledge of, or reckless disregard for, the falsity of the publicized matter and the false light in which it placed her.

333. Dr. Saeidi suffered actual damage as a result, including injury to her reputation, the loss of her employment and her directorship, and emotional distress.

**COUNT XII**
**Tortious Interference with Contract and Business Expectancy (Arkansas Law)**
*(Against Defendants Bazargan and AAIRIA)*

334. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

335. Dr. Saeidi had a contract of tenured employment with the University. She had valid business expectancies in her directorship and its compensation, her scholarly reputation, her publishing relationship with Cambridge University Press, her degree-conferring relationship with the University of Cambridge, and the grants, invitations, and appointments of an academic career. Defendants knew of these relationship purpose.

336. Defendants are strangers to each of those relationships.

337. Defendants intentionally induced and procured the termination of the employment contract and the disruption of each expectancy. They used improper means: knowing falsehoods, procured accusations, threats to the Center's ction with state officials alleged above. This was not legitimate petitioning or fair comment. It was a campaign of fabrication conducted for the stated purpose of getting a scholar fired.

338. As a result of D interference Dr. Saeidi lost her employment, her directorship, and professional opportunities.

**<u>COUNT XIII</u>**
**Civil Conspiracy (Arkansas Law)**
*(Against Defendants Bazargan, AAIRIA, and Weinthal)*

339. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

340. Bazargan and AAIRIA combined and agreed with persons who are neither AAIRIA nor its agents to accomplish the destr by unlawful and oppressive means. Those persons include Benjamin Weinthal, who transmitted the campaign's accusations to the University u University officials, and published the accusations; the third parties from whom the campaign solicited and obtained accusatory statements University officials who, as alleged in Part M of the Facts, reached a meeting of the minds with the campaign.

341. The unlawful and oppressive means were the defamation, the false light invasion of privacy, and the tortious interference alleged above. Each participant committed overt acts in furtherance of the agreement, as alleged above.

342. In the alternative, and to the extent any participant acted as an officer or agent of AAIRIA, that participant acted for her or his own personal benefit rather than for the benefit of the organization.

343. Dr. Saeidi was injured as a direct result. Bazargan, AAIRIA, and Weinthal are jointly and severally liable for the resulting damages.

**<u>COUNT XIV</u>**
**Hate Offenses (Arkansas Law)**

*(Against Defendants Bazargan and AAIRIA)*

344. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

345. Pursuant to the Arkansas Civil Rights Act of 1993, Dr. Saeidi was victim of hate offenses by both Lawdan Bazargan and AAIRIA. as defined by Ark. Code Ann. § 16-123-106.

346. Dr. Saeidi continues to be the victim of a vicious campaign, steered by Lawdan and the AAIRIA, that has labeled her as a terrorist, an operative of the Iranian government, and someone who cannot be trusted by the United States.

347. The speech engaged in by Bazargan and the AAIRIA does not constitute protected speech under the First Amendment.

348. At a minimum, the conduct of Lawdan Bazargan and the AAIRIA, constitutes intimidation or harassment under this statute, given the multiple and continuing communications that characterize Dr. Saeidi as a terrorist that have been distributed and communicated to Dr. Saeidi, her now previous employers, her colleagues, the Arkansas legislature, and Cambridge University, Dr. Saeidi's degree-granting institution.

349. Lawdan Bazargan and AAIRIA's targeting of D

animus toward Dr. Saeidi's Iranian national o

**COUNT XV**

**Breach of Contract (Arkansas Law)**

*(Against Defendants Brian Raines, Charles F. Robinson, James Gigantino, and Jay B. Silveria)*

350. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

351. The University made specific promises and assertions to Dr. Saeidi regarding freedom of speech, academic freedom, and good faith and fair dealing, in its contracts and student and faculty manuals, on its websites, and in various statements by its spokespeople.

352. The University's Board Policy 405.1 states "No faculty member shall be dismissed, or otherwise disciplined, or denied reappointment in violation of the following principles of academic freedom, but the observation of the limitations stated herein is the responsibility of each faculty or staff member. Subject to all provisions of this and other applicable University policies, mere expressi scholarship, . . . however vehemently expressed and however controversial such opinions may be, shall not constitute cause for dismissal. The threat of dismissal will not be used to restrain faculty members in their exercise of academic freedom or constitutional rights. "

353. Dr. Saeidi relied on these and substantially similar statements in making her decision to join the University of Arkansas faculty and remain as a tenured professor.

354. These statements constitute material and specific commitments made by the University to its faculty that are contractual in nature and enforceable by law.

355. Defendants are accordingly in breach of contract with Dr. Saeidi.

356. Defendants' breach of contract injured directorship and tenured employment and causing severe ongoing emotional distress.

**<u>COUNT XVI</u>**
**Arkansas Act 721 is Unconstitutional**
*(Against Defendant Silveria in his official capacity)*

357. Dr. Saeidi re-alleges and incorporates the Facts and the Injury sections of this Complaint.

358. As President of the University system, Defendant Silveria is tasked with ensuring the enforcement of Act 721 on the University's. In order to comply with Act 721, the University incorporated the Act's definition into its non-discrimination policy, investigated Dr. Saeidi under that policy twice, and ultimately terminated her on a finding made under it. Both Defendant Robinson and Defendant Silveria's decisions for Dr. Saeidi's termi cited concerns for the University's funding that could be restricted as a result of perceived non-compliance with Act.

359. Act 721 also provided AAIRIA with the legal foundation to escalate and ultimately succeed with their campaign to fire Dr. Saeidi.

360. As applied to Dr. Saeidi, the Act punished her protected first amendment speech and was the basis for her termination from the University. The University's antis hinged on an X repost, without comment, of another person's post about Israel, on her personal account, on a matter of public concern. No student or colleague complained of it. The University's faculty committee found that the post was not a threat and did not violate the University's policy against discriminatory harassment.

361. As applied, the Act discriminated on the basis of her viewpoint. The illustrative examples of antisemitism the Act incorporates single out adverse opinions regarding the State of Israel. The Act's own exception, that criticism of Israel similar to the criticism leveled against any other country shall not be regarded as antisemitic, was not applied to her.

362. Dr. Saeidi has undoubtedly been harmed by Act 721 and has standing to challenge Act 721. She challenges Act 721 on two counts

Clause of the 14th Amendment; and 2) ee Act 721'

speech.

363. Under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, Dr. Saeidi challenges the constitutionality of Act 721.

**i. <u>Act 721 is Void for Vagueness</u>**

364. The Act improperly relies on IHRA’s “wo
well as its “contemporary examples” of antise
examples created by the IHRA to define antisemitism.

365. The Act also includes an apparent Free Speech carve-out contained in Ark. Code Ann. § 6-60-1905, which limits the bounds of antisemitism to exclude criticism of Israel that is
“similar to the criticism leveled against any

366. Both sections of the Act are void for vagueness under the Due Process clause of the 14th Amendment, as it is unclear what exact types of speech are enough to trigger an
antisemitism charge or to disavow an antisemi
potential criticism against Israel.

367. The Act is unconstitutionally vague, as applied to Dr. Saeidi and on its face, to the extent it makes the IHRA definition and its examples a standard of employee discipline. The IHRA calls its definition "non-legally binding." It introduces its examples as matters that "could, taking into account the overall context, include, but are not limited to" those listed. The Act's exception turns on whether criticism of Israel is "similar to" criticism of any other country.

368. As a result of the vagueness of the Act and the subjective nature of who gets to
determine what “antisemitism” is, the continu
prosecuting speech like Dr. Saeidi’s conduct without
could trigger an antisemitism violation.

369. The University's own record shows that the standard cannot be applied consistently. Applying the same definition to the same professor's posts on the same subject, its compliance office found no violation on November 24, 2025, and found a violation on December 15, 2025. Its faculty committee found no violation on February 27, 2026. Its President found a violation on March 26, 2026.

370. As a result of the vague nature of the

triggering Act 721, which directly led to her termination from the University.

**ii. <u>Act 721 Violates the First Amendment of the Constitution</u>**

371. The Act's carve out for free speech pur

contained in Ark. Code Ann. § 6-60-1905, is superficial in nature.

372. Ark. Code Ann. § 6-60-1905 imposes a limitation on the [ability to]

criticize the state of Israel's actions, whic

373. Further, Act 721's reliance on the IHRA

its contemporary examples of antisemitism eff

actions and policies, as well as the politics of Zionists, who are not members of a specific religious group or nationality.

374. The IHRA's list of contemporary example

that the "existence of the State of Israel is [-documented abuse]

of Israel's racism and propensity to harm the

375. The IHRA's list, now contained in Act 7

enforces "double standards" upon the state of

demanded of any other democratic nation."

376. Criticism of Israel is also deemed anti
and images associated with classic antisemiti
policies to that of Nazi policies. ”

377. Given these examples, it is clear that Act 721 goes beyond curtailing unprotected
speech into unconstitutionally restricting a
actions as a matter of foreign policy interest.

378. Dr. Saeidi’s speech contained in unconstitutionally restricted in her X
defiance of the First Amendment of the U.S. constitution; this illegal restriction cost Dr. Saeidi her employment.

379. Dr. Saeidi’s injury continues because o
antisemitism that is premised on Act 721 remains on Dr. Saeidi's University record, and her termination continues to rests on that finding.

380. Dr. Saeidi seeks her reinstatement of her pervious position with the University, which would involve the termination of the positive antisemitism finding against Dr. Saeidi and thus necessitate a review of the constitutionality of Act 721.

381. If reinstated, Dr. Saeidi intends to continue speaking and writing about Israel, Palestine, and Iran, causing her to be at risk of violating the overly restrictive Act 721 again in violation of her right to free speech.

382. For these reasons, Act 721 should be ruled unconstitutional and struck down as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Declare that the Board of Trustees violated Title VII of the Civil Rights Act of 1964, and that Defendant Silveria's continuing f position violates the First and Fourteenth Amendments;

b. Order Defendant Silveria, in his official capacity, to reinstate Dr. Saeidi to her tenured position as Associate Professor of Political Science;

c. Award back pay, lost benefits, prejudgment interest, and, if reinstatement is not ordered, front pay, against the Board of Trustees under Title VII;

d. Award compensatory damages for reputational injury, emotional distress, and consequential losses against Defendants Raines, Robinson, Gigantino, Schulte, Schreckhise, Silveria, and Sullivan in their individual capacities and against Defendants Bazargan, AAIRIA, and Weinthal;

e. Award nominal damages against those same Defendants on each claim on which compensatory damages are not awarded;

f. Award punitive damages against Defendants Raines, Robinson, Gigantino, Schulte, Schreckhise, Silveria, and Sullivan in their individual capacities and against Defendants Bazargan, AAIRIA, and Weinthal;

g. Award attorneys' fees and costs under 42 -5(k);

h. Declare Arkansas Act 721 to be unconstitutional on the basis of its prohibition of Dr. Saeidi's free speech and curtailing of her d

i. Grant such other and further relief as is just.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: October 6, 2026

Respectfully submitted,

*/s/ Connor Thompson*
Connor Thompson (Ark. Bar #2022135)
Badria C. Mryyan (Ark. Bar #2021280)
Mryyan Thompson PLLC
P.O. Box 164045
Little Rock, AR 72216
(501) 530-4002
connor@mryyanthompson.com
badria@mryyanthompson.com

P. Jenny Marashi, Esq. (N.Y. Bar #4347969)*
Marashi Legal
930 Grand Concourse #1E
Bronx, NY 10451
(917) 703-1742
marashi.legal@gmail.com
**pro hac vice application forthcoming*

*Counsels for Plaintiff Shirin Saeidi*